# IN THE SUPREME COURT OF IOWA

No. 25 / 04-1327

Filed May 19, 2006

**STATE OF IOWA,**

Appellee,

vs.

**JESSE LEE SIMMONS,**

Appellant.

Appeal from the Iowa District Court for Page County, James S. Heckerman (motion to suppress), Timothy O'Grady (trial), and J.C. Irvin (sentencing), Judges.

Defendant appeals his conviction and sentence for manufacturing methamphetamine in violation of Iowa Code section 124.401(1)(*b*)(7) (2003). **AFFIRMED.**

Linda Del Gallo, State Appellate Defender, and Martha J. Lucey, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney General, Richard Davidson, County Attorney, and Paul Walter and Tony Almquist, Assistant County Attorneys, for appellee.

**WIGGINS, Justice.**

The defendant was found guilty of manufacturing methamphetamine in violation of Iowa Code section 124.401(1)(*b*)(7) (2003).  In this appeal, the defendant challenges the district court's ruling on his motion to suppress as to the items seized from his apartment and the statements he made to police officers.  Additionally, he claims his trial counsel provided ineffective assistance of counsel by failing to challenge the constitutionality of a sentencing statute, Iowa Code section 901.10(2).  Because we find the defendant's claims are without merit, we affirm the judgment of the district court.

## I.  Background Facts and Proceedings.

At approximately 11:37 p.m. on December 3, 2003, police officer Jesse Hitt responded to a complaint of loud music coming from apartment eight of Parkview Apartments in Clarinda, Iowa.  The access to the apartments is from the outside, requiring Hitt to go up an outside set of stairs and then enter a door into a hallway where the apartments are located.  While he was at apartment eight, Hitt smelled what he suspected to be anhydrous ammonia coming from apartment nine across the hall.

Hitt did not perceive an emergency to prompt him to evacuate the apartment building when he first detected the odor.  Hitt went to the police station and contacted lieutenant Keith Brothers at his home at approximately 12:08 a.m.  Having safety concerns for the tenants of the apartment building and fearful of a potential fire or explosion, Brothers advised Hitt to contact sergeant David Rine, a state-certified clandestine methamphetamine lab expert.  Brothers wanted Hitt and Rine to go to the apartment building so Rine could verify the odor as that of anhydrous ammonia.  Brothers further advised Hitt if Rine believed a working

methamphetamine lab was inside the apartment, he should knock, announce, and make entry without a warrant.

Hitt contacted Rine at his home and they met at the police station. They and another officer went to the apartment building at 12:43 a.m. Rine confirmed the odor in the hallway was that of anhydrous ammonia. Rine was not aware of any legitimate purpose for possessing anhydrous ammonia in an apartment, but he knew it is used to manufacture methamphetamine. Rine also knew the risks created by a methamphetamine laboratory include fires created from the fumes, chemical exposures, inhalation exposures from the toxic fumes, and waste products left over from the chemical reactions. Rine further knew these risks not only affect the people making the methamphetamine, but also affect other residents in a multiple-occupant dwelling.

Hitt knocked on the door and a woman asked who was there. Hitt announced it was the police. The woman then asked what they wanted. Hitt responded they were there for a safety check because they could smell anhydrous ammonia, and said the door needed to be opened immediately. Receiving no response, Hitt knocked again because the officers could hear something in the apartment, and advised her to open the door or they would force it open. At this time, Rine became concerned about the strong odor of anhydrous ammonia. Rine did not know whether there was a working methamphetamine lab or a container leaking anhydrous ammonia. He was worried about the safety of the occupants of the apartment as well as the safety of the other occupants of the building.

Again receiving no response from the occupants of the apartment, the officers forcibly entered the apartment with guns drawn. The odor of anhydrous ammonia was strong. The officers observed Cindy Cordell

standing in the middle of the room and ordered her to get down on the floor. The defendant, Jesse Lee Simmons, walked into the room from the back of the apartment. Rine had his gun pointed at Simmons. The strong smell of anhydrous ammonia caused Rine's eyes to water. Rine asked Simmons if there was an active methamphetamine lab in the apartment. Simmons responded there was. Rine asked where the lab was located and Simmons told him it was in the bathroom. Rine then asked what stage it was in to determine the chemicals and risks involved. Simmons answered by stating the lab was in the first rinse stage, the lab belonged to him, and Cordell was not involved with the lab.

The officers handcuffed Cordell and Simmons, removed them from the apartment, and gave them decontamination suits to wear. Due to the risk of chemical exposure, Rine was unable to conduct a safety sweep of the apartment at that time. He was not concerned about other individuals being in the apartment because either Cordell or Simmons told him no one else was in the apartment. Rine closed the door to the apartment. The officers also evacuated the occupants of apartment eight.

Rine then contacted dispatch, performed a perimeter sweep of the building for other risks, and discussed a possible evacuation of the remainder of the building with the fire chief. He reentered the apartment in protective gear with a second lab tech to conduct a safety sweep and remove the containers and chemicals from the apartment. Upon reentry, Rine tested the anhydrous ammonia levels in the apartment. The levels were almost three times the acceptable OSHA levels for short-term exposure. The officers found, among other items, a glass one-gallon container in the bathtub containing a bluish tinted liquid, a funnel, and a blue shop towel. There was also some off-white sludge residue in the bathtub. The officers

removed these items and preserved them as evidence. After neutralizing the problem in the apartment by removing the hazardous items and ventilating the apartment, the officers left the apartment and waited for Brothers' instructions.

Brothers arrived at the apartment building twenty to thirty minutes after the initial entry into the apartment. Simmons was in handcuffs and accompanied by an officer. Upon seeing Simmons, Brothers said, "[H]ello, Jesse, what's going on." Simmons responded by repeating what he told Rine, that the lab was all his and Cordell had nothing to do with it. Later, Brothers talked to Simmons again. This conversation took place in a police car. After Brothers advised Simmons of his *Miranda* rights, Simmons again stated the lab was his and Cordell had nothing to do with it.

Brothers talked to Cordell when she was in a police car. Brothers asked her to consent to a search of the apartment. She eventually did so after some discussion between her and Brothers. After receiving Cordell's consent, Rine entered the apartment for a third time and collected non-hazardous items used in the methamphetamine-making process.

Simmons was charged with two counts: (1) conspiring or acting with others to manufacture, deliver, or possess more than five grams of a schedule II controlled substance (methamphetamine) with intent to manufacture or deliver in the presence of a minor and within one thousand feet of certain real property, in violation of Iowa Code sections 124.401(1)(*b*)(7), 124.401A, and 124.401C(1), (2)(*b*)-(*c*), 2(*e*); and (2) unlawful possession of a precursor substance in violation of Iowa Code section 124.401(4)(*b*). The State filed an amendment to the trial information alleging Simmons was a habitual offender in count two in violation of Iowa Code sections 902.8 and 902.9(3).

Simmons pled not guilty and filed a motion to suppress evidence and a waiver of jury trial. He subsequently filed an amended motion to suppress. The district court overruled the motion to suppress.

The parties submitted the case to the court based on the minutes of testimony in order to preserve Simmons' right to appeal the suppression ruling. The State agreed to amend count one by deleting all enhancing charges and dismiss count two. The court found Simmons guilty of manufacturing methamphetamine in violation of Iowa Code section 124.401(1)(*b*)(7), a class "B" felony. The court sentenced Simmons to a term of imprisonment not to exceed twenty-five years. Simmons appeals.

## II. Issues.

There are two issues on appeal: (1) whether the district court erred in overruling Simmons' motion to suppress evidence as to the search of the apartment and the statements made to officers; and (2) whether Simmons' trial counsel provided effective assistance of counsel in regards to the failure to challenge the constitutionality of Iowa Code section 901.10(2).

## III. Scope of Review.

The first issue presented in this case is whether the district court erred in not suppressing certain physical evidence and statements. Simmons claims the district court should have granted his motion to suppress based on the federal and state constitutions; therefore, our review is de novo. *State v. Freeman*, 705 N.W.2d 293, 297 (Iowa 2005). This review requires us to " 'make an independent evaluation of the totality of the circumstances as shown by the entire record.' " *State v. Turner,* 630 N.W.2d 601, 606 (Iowa 2001) (citation omitted). We give deference to the factual findings of the district court due to its opportunity to evaluate the credibility of the witnesses, but we are not bound by such findings. *Id.*

The second issue presented in this case is whether Simmons' trial counsel provided effective assistance of counsel in regards to the failure to challenge the constitutionality of Iowa Code section 901.10(2). Simmons asserts his ineffective-assistance-of-counsel claim based on the federal and state constitutions. Although these claims are typically preserved for postconviction relief actions, "we will address such claims on direct appeal when the record is sufficient to permit a ruling." *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005).

**IV. Analysis.**

*A. The initial search of the apartment.* Simmons asserts the initial search of the apartment was in contravention of the Fourth Amendment to the United States Constitution. The Fourth Amendment assures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment is binding on the states through the Fourteenth Amendment of the federal constitution. *Freeman*, 705 N.W.2d at 297.

Simmons also asserts the search violated article I, section 8 of the Iowa Constitution. That section guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated." Iowa Const. art. I, § 8. "Because [Simmons] has not asserted and we have not found a basis to distinguish the protection afforded by the Iowa Constitution from those afforded by the federal constitution under the facts of this case, our analysis applies equally to both the state and federal grounds." *State v. Carter*, 696 N.W.2d 31, 37 (Iowa 2005).

Unless a recognized exception to the warrant requirement exists, searches and seizures conducted without a warrant are per se

unreasonable. *Freeman*, 705 N.W.2d at 297. These exceptions include " 'searches based on consent, plain view, probable cause coupled with exigent circumstances, searches incident to arrest, and those based on the emergency aid exception.' " *Id.* (citation omitted).

The State is required to prove a recognized exception to the warrant requirement by a preponderance of the evidence. *Id.* A court cannot admit evidence obtained in violation of the Fourth Amendment. *Id.* In determining if one of the recognized exceptions is applicable, the court must assess a police officer's conduct based on an objective standard. *Id.* A search's legality does not depend on the actual motivations of the police officers involved in the search. *Id.*

We must first determine whether Simmons had a legitimate expectation of privacy, both subjectively and objectively, in the premises searched. *State v. Lovig*, 675 N.W.2d 557, 562-63 (Iowa 2004). We make this determination based on the unique facts of each case. *Id.* at 563. We have said the Fourth Amendment clearly protects physical entry into one's home. *Id.* We have acknowledged a legitimate expectation of privacy may extend to protect an overnight guest in the host's home, but we have also recognized there is no legitimate expectation of privacy if a guest is there simply to conduct a business transaction. *Id.*

Neither the State nor Simmons challenge Simmons' legitimate expectation of privacy in the apartment. At the time of the search, Simmons claimed to be living with Cordell in the apartment for approximately six weeks. Although he listed a friend's address in his application for court-appointed counsel, Simmons kept clothing and personal belongings at the apartment. He testified he used his friend's address as a mailing address because he works on the road. Cordell

confirmed Simmons had lived in the apartment for six weeks and he kept clothes and personal belongings there. Considering the circumstances of this case in view of the values of the Fourth Amendment, Simmons did have a legitimate expectation of privacy in the apartment.

Next, we must determine whether the State proved an exception to the warrant requirement by a preponderance of the evidence. The State contends probable cause coupled with exigent circumstances relieved the officers from the obligation to obtain a warrant. Probable cause to search exists if, given the totality of the circumstances, "a person of reasonable prudence would believe that evidence of a crime might be located on the premises to be searched." *State v. Davis*, 679 N.W.2d 651, 656 (Iowa 2004).

While it does not appear we have previously addressed the effect an odor may have on probable cause to search under circumstances such as those presented here, we have found probable cause in a somewhat similar situation. *See State v. Eubanks*, 355 N.W.2d 57, 59 (Iowa 1984) (finding an officer had sufficient probable cause to search a vehicle and its contents based on the odor of marijuana drifting from the vehicle). The Supreme Court has discussed when the detection of an odor establishes sufficient probable cause for a magistrate to issue a search warrant. *Johnson v. United States*, 333 U.S. 10, 13, 68 S. Ct. 367, 369, 92 L. Ed. 436, 440 (1948). There the Court stated:

> If the presence of odors is testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant. Indeed it might very well be found to be evidence of most persuasive character.

*Id.*

In this case, Hitt smelled what he suspected to be anhydrous ammonia. Not being an expert in the area of methamphetamine labs, Hitt contacted his superior, Brothers, for instructions on how to proceed. Brothers advised Hitt to meet with Rine, a state-certified clandestine methamphetamine lab expert, to assess the situation. Rine, who had experience in handling clandestine methamphetamine labs, determined the distinctive odor in the hallway was in fact that of anhydrous ammonia. Rine knew there was no legitimate purpose for possessing anhydrous ammonia in an apartment and he knew it is used to manufacture methamphetamine. Based on Rine's training and experience, coupled with the distinct odor of anhydrous ammonia and the lack of household uses for it, we find the officers had probable cause to believe the occupants of the apartment were engaged in criminal activity. *See United States v. Clayton*, 210 F.3d 841, 845 (8th Cir. 2000) (finding an officer's perception of an odor associated with methamphetamine production constituted probable cause for a search); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 28 F.3d 1388, 1393-94 (5th Cir. 1994) (finding a chemical odor associated with the manufacturing of amphetamines, detected by an officer familiar with such odors through experience and training, may alone establish probable cause); *United States v. Sweeney*, 688 F.2d 1131, 1137 (7th Cir. 1982) (finding an officer who is qualified to identify an odor, which is sufficiently distinctive to identify the manufacture of methamphetamine, may establish probable cause for a search warrant).

Finally, we must determine whether exigent circumstances existed to allow the warrantless search. We have found exigent circumstances to exist where a danger of violence and injury to officers or others is present. *State v. Holtz*, 300 N.W.2d 888, 893 (Iowa 1981). When an exigency poses a

threat of danger to others, officers can perform a limited search to remove the immediate risk. *United States v. Walsh,* 299 F.3d 729, 734 (8th Cir. 2002).

The volatile nature of and the dangers created by methamphetamine labs can be exigent circumstances justifying an immediate limited search of premises harboring such a lab. *Kleinholz v. United States,* 339 F.3d 674, 677 (8th Cir. 2003). In this case, Rine's confirmation of the odor as anhydrous ammonia, its use in manufacturing methamphetamine, and the risks created by a methamphetamine lab in a multiple-occupant dwelling support a finding of exigency. Numerous cases have upheld limited searches conducted by officers without a warrant to eliminate the potential hazards of a methamphetamine lab when the officers had probable cause to believe they had discovered an ongoing methamphetamine lab. *United States v. Lloyd,* 396 F.3d 948, 954 (8th Cir. 2005); *see also Walsh,* 299 F.3d at 734 (collecting precedent from other federal circuit courts of appeals).

Here, the testimony of the officers establishes the dangers of methamphetamine manufacturing. Besides the risk of fire or explosion, the exposure to the fumes of anhydrous ammonia posed a serious threat to the persons manufacturing the drug, the officers who entered the apartment, and the neighbors who were evacuated from their apartment across the hall. During the initial search of the apartment, the officers conducted a limited search, only removing the hazardous items that posed an immediate threat. After determining the levels of anhydrous ammonia in the apartment exceeded the acceptable OSHA levels for short-term exposure by almost three times, the officers ventilated the apartment, left the apartment, and waited for further instructions before entry was made for the third time.

Simmons argues the officers' conduct in this case, such as the time delay between Hitt's detection and Rine's confirmation of the odor, and the lack of consideration to evacuate the other tenants before Rine's confirmation of the odor, was inconsistent with the claimed exigency. It is possible that an officer's conduct "which is in any way inconsistent with the purported reason for the entry is a just cause for healthy skepticism by the courts." *See* 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.6(a) (4th ed. 2004). However, Simmons' argument misses the mark here because an officer is required to have specific, articulable grounds justifying a finding of exigency, and a warrantless search's legality is not determined by the subjective beliefs of the officer involved. *State v. Naujoks*, 637 N.W.2d 101, 109 (Iowa 2001). Thus, the alleged inconsistency of the officers' actions in the instant case, which supposedly evidences their subjective beliefs as to the lack of exigency of the situation, is irrelevant to the objective assessment of whether the search was reasonable based on exigent circumstances.

When Hitt first detected the odor of what he suspected was anhydrous ammonia, his lack of experience did not allow him to fully comprehend the gravity of the situation. When he returned to the apartment building with Rine, the dangers of a working methamphetamine lab continued to exist and nothing in this record suggests the exigency had disappeared by the time Hitt and Rine arrived at the building. Moreover, the conclusion that a bona fide exigency existed is supported by the officers' conduct, which included removing Cordell and Simmons from the apartment, giving them decontamination suits, evacuating the occupants of apartment eight, discussing a possible evacuation of the remainder of the

building with the fire chief, and reentering the apartment in protective gear to remove the hazardous items from the apartment.

Accordingly, there were exigent circumstances present in this case. Therefore, the presence of probable cause coupled with exigent circumstances makes the initial search of the apartment an exception to the warrant requirement.

*B. The first statements made by Simmons when the officers entered the apartment.* The Fifth Amendment to the United States Constitution states "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The right against self-incrimination applies to the states because it is incorporated into the Due Process Clause of the Fourteenth Amendment. *Turner,* 630 N.W.2d at 606. Before a person in custody may be interrogated, the person must be advised as to the right to remain silent and the right to have appointed counsel present. *Id.* at 607. These *Miranda* requirements do not come into play unless both custody and interrogation are present. *Id.* Custodial interrogation is defined as " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Id.* (citation omitted).

In regards to custody, we use an objective test where the inquiry is how a reasonable person in the suspect's position would have understood the situation. *Id.* In making this determination, we may consider " 'the language used to summon the individual, the purpose, place and manner of the interrogation, the extent to which the defendant is confronted with evidence of his guilt, and whether the defendant is free to leave the place of questioning.' " *State v. Smith,* 546 N.W.2d 916, 922 (Iowa 1996) (citations

omitted). For purposes of this appeal, we will assume without deciding Simmons was in custody at this time.

We have recognized a public safety exception to the *Miranda* requirements. *State v. Deases,* 518 N.W.2d 784, 790-91 (Iowa 1994). Such an exception exists where "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *New York v. Quarles,* 467 U.S. 649, 657, 104 S. Ct. 2626, 2632, 81 L. Ed. 2d 550, 558 (1984). The exception applies if the officer's question is not "designed solely to elicit testimonial evidence from a suspect." *Id.* at 658-59, 104 S. Ct. at 2633, 81 L. Ed. 2d at 559.

When Rine entered the apartment, the strong odor of anhydrous ammonia was present. This odor posed a safety risk to him, his fellow officers, the occupants of the apartment, and the neighbors. At that point, Rine did not know if an ignition source was available or if a fire or explosion could occur. We conclude Rine's inquiries as to the presence and status of a methamphetamine lab were for the purpose of obtaining information that would help him safely address the potentially volatile and dangerous situation confronting the officers at the scene, and not solely to obtain incriminating information from Simmons. Therefore, Simmons' admissions in response to Rine's inquiries are admissible in spite of the fact Rine did not advise him of his *Miranda* rights.

*C. The other statements made by Simmons to Brothers.* Simmons asserts the statements he made to Brothers while he was handcuffed and accompanied by an officer are inadmissible due to Brothers' failure to advise him of his *Miranda* rights prior to Brothers stating to him, "[H]ello, Jesse, what's going on." Simmons also asserts the statements he made to

Brothers in the police car after receiving his *Miranda* rights are also inadmissible because there was no break in the causal connection between the alleged illegal police actions and the statements obtained after Simmons received his *Miranda* rights. Even if we assume without deciding these statements were inadmissible, we find their admission was harmless beyond a reasonable doubt.

"In order for a constitutional error to be harmless, the court must be able to declare it harmless beyond a reasonable doubt." *Deases*, 518 N.W.2d at 791. In assessing whether a constitutional error was harmless, we have stated:

> There are two steps in the harmless error analysis. We first consider all of the evidence the jury actually considered, and then we weigh the probative force of that evidence against the erroneously admitted evidence. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict *actually* rendered in this *trial* was surely unattributable to the error.

*State v. Canas*, 597 N.W.2d 488, 493-94 (Iowa 1999) (citations omitted), *abrogated on other grounds by Turner*, 630 N.W.2d at 606 n.2.

Here, the statements Simmons gave to Brothers in each of the above instances were substantially the same statements Simmons gave to Rine in the apartment. We have already concluded Simmons' statements to Rine were admissible under the public safety exception to the *Miranda* requirements. "If substantially the same evidence is in the record, erroneously admitted evidence is not considered prejudicial." *Deases*, 518 N.W.2d at 791. Consequently, the district court's finding of guilt could not be attributable to the second or third statements made to Brothers. Therefore, any alleged error is harmless beyond a reasonable doubt.

*D. Evidence seized after Brothers obtained Cordell's consent to search the apartment.* Simmons asserts the consent Cordell gave Brothers to enter the apartment for a third time was not given voluntarily and the items seized based on such consent should have been suppressed. Again, even if we assume without deciding these items were inadmissible, their admission was harmless beyond a reasonable doubt. We have already determined the containers and chemicals seized during the initial limited search were admissible. The DCI Criminalistics Laboratory tested these items and determined they contained methamphetamine or precursors of methamphetamine. The items seized after receiving Cordell's consent were the non-hazardous items used to manufacture methamphetamine.

In applying the constitutional harmless error test, we are satisfied beyond a reasonable doubt the district court's finding of guilt could not be attributable to the evidence of the non-hazardous items. The properly seized evidence coupled with the admission of Simmons that it was his lab overwhelmingly establishes Simmons was guilty of manufacturing methamphetamine. Accordingly, any alleged error is harmless beyond a reasonable doubt.

*E. Ineffective-assistance-of-counsel claim.* "In order for a defendant to succeed on a claim of ineffective assistance of counsel, the defendant must prove: (1) counsel failed to perform an essential duty and (2) prejudice resulted." *Wills,* 696 N.W.2d at 22. In order to satisfy the first element, " 'counsel's performance is measured against the standard of a reasonably competent practitioner with the presumption that the attorney performed his duties in a competent manner.' " *State v. Doggett,* 687 N.W.2d 97, 100 (Iowa 2004) (citations omitted). Prejudice exists where " 'there is a reasonable probability that, but for the counsel's unprofessional errors, the

result of the proceeding would have been different.' " *Wills*, 696 N.W.2d at 22 (citations omitted).

Simmons argues his trial counsel had a duty to challenge the constitutionality of Iowa Code section 901.10(2) under equal protection principles as it effectively penalizes defendants for exercising their right against self-incrimination and their right to a jury trial. Section 901.10(1) allows a sentencing court to sentence a person for a first conviction "to a term less than provided by the statute if mitigating circumstances exist and those circumstances are stated specifically in the record." Iowa Code § 901.10(1). However, the sentencing court is not allowed to reduce the sentence for a first conviction "if the sentence under section 124.413 involves an amphetamine or methamphetamine offense under section 124.401, subsection 1, paragraph '*a*' or '*b*' " unless the defendant pleads guilty. *Id.* § 901.10(2). Simmons claims a strict scrutiny review should apply here because fundamental rights are implicated. He asserts the statute fails such review because there is no compelling state interest in treating methamphetamine offenses constituting a class "B" felony different than other class "B" felony drug offenses or class "C" felony methamphetamine offenses based on whether the defendant pleads guilty or goes to trial.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution disallows states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Iowa Constitution states "[a]ll laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6. We

acknowledge we have the obligation to determine whether a challenged law violates Iowa's constitutional equality provision. *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 4 (Iowa 2004). While the judgment of the Supreme Court under the federal Equal Protection Clause is persuasive, it does not bind this court's evaluation of the law under the Iowa Constitution. *Id.* at 5. Nevertheless, "[b]ecause neither party in this case has argued that our equal protection analysis under the Iowa Constitution should differ in any way from our analysis under the Federal Constitution, we decline to apply divergent analyses in this case." *Sanchez v. State*, 692 N.W.2d 812, 817 (Iowa 2005).

We subject laws to different levels of review based on their classifications and the rights they affect. *Id.*

> If a statute affects a fundamental right or classifies individuals on the basis of race, alienage, or national origin, it is subjected to strict scrutiny review. The State must prove it is narrowly tailored to the achievement of a compelling state interest. If a statute classifies individuals on the basis of gender or legitimacy, it is subject to intermediate scrutiny and will only be upheld if it is substantially related to an important state interest.

*Id.* (citations omitted). However,

> "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."

*Id.* (alteration in original) (citation omitted). Rational basis review requires only that the law "be rationally related to a legitimate state interest." *Id.* at 817-18. Such review allows a State to act on the basis of certain differences where a rational relationship exists between the disparity in treatment and some legitimate government purpose. *Id.* at 818.

In *State v. Biddle*, we applied the rational basis test and determined section 901.10(2) is "rationally related to the government's interest in curbing the increasing and widespread use of methamphetamine, a highly addictive drug." 652 N.W.2d 191, 203 (Iowa 2002). In *Biddle*, we did not examine the statute under a strict scrutiny analysis because the defendant failed to preserve error on the application of this test. *Id.* However, the Supreme Court has addressed an equal protection challenge alleging a similar statutory scheme penalized a defendant for exercising a fundamental right. *Corbitt v. New Jersey*, 439 U.S. 212, 225, 99 S. Ct. 492, 500, 58 L. Ed. 2d 466, 478 (1978).

There a New Jersey statutory scheme provided for mandatory punishment of life imprisonment for a defendant convicted by a jury of first-degree murder, but allowed the possibility of a sentence of less than life imprisonment for a defendant who entered a plea of no contest. *Id.* at 214-16, 99 S. Ct. at 495-96, 58 L. Ed. 2d at 471-72. In rejecting the defendant's argument "that the sentencing scheme infringes [on a defendant's] right to equal protection under the Fourteenth Amendment because it penalizes the exercise of a 'fundamental right,'" the Court stated:

> We rejected a similar argument . . . noting that "[t]o fit the problem . . . into an equal protection framework is a task too Procrustean to be rationally accomplished." All New Jersey defendants are given the same choice. Those electing to contest their guilt face a certainty of life imprisonment if convicted of first-degree murder; but they may be acquitted instead or, in a proper case, may be convicted of a lesser degree of homicide and receive a sentence of less than life. Furthermore, a plea of [no contest] may itself result in a life sentence. The result, therefore, "may depend upon a particular combination of infinite variables peculiar to each individual trial. It simply cannot be said that a state has invidiously 'classified' . . . ." It cannot be said that defendants found guilty by a jury are "penalized" for exercising the right to a jury trial any more than defendants who plead guilty are penalized because they give up the chance of acquittal at trial. In each

> instance, the defendant faces a multitude of possible outcomes and freely makes his choice. Equal protection does not free those who made a bad assessment of risks or a bad choice from the consequences of their decision.

*Id.* at 225-26, 99 S. Ct. at 500-01, 58 L. Ed. 2d at 478 (citations omitted). Accordingly, if Simmons' trial counsel had raised this issue, the trial court should have found the statutory scheme did not violate the state or federal Equal Protection Clauses. Therefore, Simmons' claim of ineffective assistance of counsel must fail. *See Wills*, 696 N.W.2d at 24 (finding trial counsel was not ineffective for failing to raise an issue with no merit).

### V. Summary and Disposition.

We find no error in the district court's ruling on the motion to suppress regarding the initial search of the apartment and the first statements made by Simmons when the officers entered the apartment. We do not reach the other issues raised by Simmons regarding the motion to suppress because any constitutional error alleged was harmless beyond a reasonable doubt. Finally, we find Simmons' trial counsel was not ineffective in failing to challenge the constitutionality of Iowa Code section 901.10(2). Therefore, we affirm the judgment of the district court.

**AFFIRMED.**