**IN THE COURT OF APPEALS OF IOWA**

No. 13-0335
Filed June 11, 2014

**ROBERT JORDAN,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Mary Pat Gunderson,

Judge.


        Robert Jordan appeals the district court's denial of his application for

postconviction relief.  **AFFIRMED.**



        Christine E. Branstad of Branstad Law, P.L.L.C., Des Moines, for

appellant.

        Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney

General, John P. Sarcone, County Attorney, and Michael Hunter and Jaki

Livingston, Assistant County Attorneys, for appellee State.



        Considered by Vogel, P.J., and Doyle and Mullins, JJ.

**DOYLE, J.**

In 2004, following a jury trial, Robert Jordan was convicted of two counts of first-degree murder. In its ruling on direct appeal, this court set forth the following facts surrounding the murders:

> On February 26, 2001, Glenda Chiles entered Jeff Johnson's house in Des Moines and discovered the bodies of Johnson and her boyfriend, Steven Jenkins. Both men had been shot twice with a shotgun. Johnson had been shot in the lower back and then in the head. Jenkins had been shot in the shoulder and the back of the head. Both bodies showed signs of decomposition. Four red shotgun shell casings were discovered near the bodies. All four shells had been fired from a twelve-gauge Mossberg shotgun. Jenkins had last spoken with Chiles on February 23 when he borrowed her car with the understanding he would return it later that evening.
>
> Following a lengthy investigation, the State jointly charged Robert Jordan Jr. and Richard Christiansen with two counts of first-degree murder on October 7, 2004. Jordan pled not guilty to each charge and moved to sever his trial from Christiansen's trial. Jordan and Christiansen were tried separately. A jury found Jordan guilty of two counts of first-degree murder.[1] Jordan filed a motion for new trial, which the district court denied. Later, the court sentenced Jordan to two concurrent terms of life imprisonment. Jordan now appeals.
>
> Viewing the evidence in the light most favorable to the State, the jury could have found the following facts from the evidence presented at Jordan's trial. Emily and Mark Tongue were residing in Rockford, Illinois, in 2001. At some point in the year 2000, Emily purchased a shotgun for Mark. Her husband removed the standard stock and installed a pistol grip to make the shotgun shorter. The Tongues stored the shotgun and red shotgun shells in a closet in a bedroom in their home in Rockford. They last saw the shotgun around Christmastime in 2000.
>
> The Tongues were friends with Robert Jordan Jr. and Richard Christiansen. In early February 2001, Mark Tongue left Illinois and traveled to Las Vegas to serve a jail sentence for driving under the influence. Christiansen arrived at the Tongues' residence for a visit on approximately February 14. He was driving a stolen white Chevy Lumina. Jordan arrived at the Tongues' residence on or about February 16. Jordan and Christiansen were together in the Tongues' residence at times when Emily was not present. Jordan and Christiansen left the Tongues' home on February 18. Emily assumed the men returned to Des Moines.

In February 2001 Glenda Chiles lived with Steven Jenkins. Jenkins and Jeff Johnson were friends and fellow drug users. Johnson lived on Summit Street in Des Moines. At about 8:00 p.m. on Friday, February 23, Jenkins went out in a car belonging to Chiles. When Jenkins did not return home or call his girlfriend that evening, Chiles left a message on his answering machine. Jenkins never responded to the message.

On an undetermined night in January or February 2001, Richard Christiansen went to the Des Moines residence of his friend Mark Hardin, a drug dealer. Because Hardin was not home, Hardin's girlfriend, Connie Wilcox, directed Christiansen to the basement to see James Marts, who was living in Hardin's home. According to Marts, Christiansen was "really high, high-strung," and "buggy-eyed" during his visit.[2] Christiansen kept pacing back and forth and told Marts "something had gone bad." At some point, Christiansen made statements implicating himself in a multiple murder. Although Marts could not recall whether he heard these statements from Christiansen or from Hardin the next morning, Marts said Christiansen told him something went wrong, and "I had to kill them," or "we had to kill them." Christiansen also said he was "going to have to kill Connie [Wilcox] because Connie knows."

Later, Hardin returned to his residence and joined Marts and Christiansen. At some point, Marts left and drove Connie to her home. When Marts returned to Hardin's home the next morning, Hardin looked scared. Marts later made a statement to a Des Moines police officer that Christiansen had said something to the effect that it or something had gone bad, and either "I" or "we" had to kill them.

After Mark Tongue finished serving his jail sentence in Las Vegas, he returned to Des Moines on a bus. He arrived in Des Moines shortly after midnight on February 26, 2001. Erika Christiansen, Richard Christiansen's wife, picked Tongue up at the bus station and dropped him off at a Motel 6 in Des Moines where Jordan and Christiansen were staying. Later that day, Jordan was treated for a toothache by a Des Moines dentist.

Several days later, Jordan, Christiansen, and Mark Tongue drove from Des Moines to the Tongues' Rockford residence in the stolen Chevy Lumina. The trio arrived on March 1. By this time, Christiansen was in possession of a nine millimeter Taurus semi-automatic pistol.

On March 2, 2001, Jordan and Christiansen robbed a bank in Machesney Park, a city located near Rockford. Jordan used a pistol gripped shotgun during the armed robbery. Mark Tongue saw a televised news report about the bank robbery and realized Jordan and Christiansen fit the description of the armed robbers.

On March 3 Tongue asked the men to leave his home, and he rented a room for them at the Clocktower Inn in Rockford. Early

in the morning on March 4, the police arrested Jordan and Christiansen at the Clocktower Inn. In their motel room, the police discovered a Mossberg shotgun, a Taurus pistol, and shotgun ammunition.

During an interview with the police the morning of his arrest, Jordan told officers the shotgun used in the bank robbery belonged to him, and he stated he had possessed it "for quite a while." Jordan also admitted he had fired the shotgun before, and he said he thought the shotgun shells in the shotgun were loaded with number four buckshot. The police asked Jordan if he was "mentally . . . prepared to use that shotgun if need be," and Jordan answered, "it would depend upon the circumstances."

Jordan told the police he had known Christiansen for six or seven years, and he referred to Christiansen several times as his "partner." Jordan admitted he and Christiansen had stolen the white Chevy Lumina. Jordan also admitted he had appeared in the surveillance videotape of the bank robbery. He stated he was the "cover man" during the bank robbery and carried the shotgun. He said Christiansen was the "money man."

Eventually, the Des Moines murder investigation led police to the evidence recovered from Jordan's motel room in Rockford.[3] The shotgun used in the Illinois bank robbery and discovered in the motel room at the time of Jordan's arrest was tested by the Iowa DCI Laboratory. A criminalist was able to determine the four shells recovered from the scene of the double homicide in Des Moines in February 2001 had been fired from the twelve gauge shotgun originally owned by the Tongues and seized by police at the time Christiansen and Jordan were arrested for bank robbery. Some of the live shotgun shells found in the motel room in Rockford were identical to the shotgun shells that had been used in the murders in Des Moines eight days earlier.[4] Based on this and other information, Jordan and Christiansen were arrested for the murders of Jenkins and Johnson.

---

[1] A jury convicted Christiansen of two counts of first-degree murder in a separate trial. This court affirmed his convictions on appeal. [*See State v. Christiansen*, No. 05-0990, 2006 WL 3313854, at *2-6 (Iowa Ct. App. Nov. 16, 2006)].

[2] Marts could not recall the date or the day of the week that Christiansen came to visit.

[3] In early 2002 a Des Moines police officer went to Illinois to interview Mark and Emily Tongue. Based on information gleaned from these interviews, he contacted Illinois authorities to retrieve the shotgun used in the Machesney Park robbery.

[4] The shotgun shells found in Jordan and Christiansen's motel room and at the murder scene were made by the same manufacturer, were the same gauge and length, bore the same markings, and contained the same number four steel shot.

*State v. Jordan*, No. 05-0481, 2007 WL 3376840, at *1-3 (Iowa Ct. App. Nov. 15, 2007).

Jordan filed an application for postconviction relief. Among other claims, Jordan contended his trial counsel was ineffective in failing to "fully investigate potentially exculpatory evidence"—specifically, statements made by Christiansen's wife Erika regarding her belief that Christensen may have possessed the murder weapon several weeks before the murders.[1] According to Jordan, Erika's statements called into question the State's theory that Christensen and Jordan acquired the weapon together and "always acted together." Following a hearing, the district court entered an order denying Jordan's claims.

On appeal, Jordan challenges the district court's ruling on his postconviction application, raising claims of ineffective assistance relating to the investigation and presentation of evidence regarding Erika's statements about the presence of the murder weapon at the Christensen's house at some time before the murders. We review his claims de novo. *Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012). To prevail, Jordan must show (1) counsel failed to perform an essential duty and (2) prejudice resulted. *See id.*

Specifically, Jordan claims his trial counsel was ineffective in failing to adequately investigate Erika's statements and present the jury with evidence to support Jordan's defense, i.e., that Christensen possessed the murder weapon at some time before the murders and that Christensen acted alone in the

---

[1] As set forth above, Jordan had also raised the issue of Erika's statements regarding the murder weapon in a motion for new trial following his underlying criminal trial.

murders.[2]  He claims the evidence against him was circumstantial and evidence that Christensen possessed the gun and had previously shot the weapon at the gun range could have given the jury reason to believe Christensen also acted alone during the murders.

Because we find the prejudice prong dispositive of Jordan's claim, we begin and end our analysis there.  *See Everett v. State*, 789 N.W.2d 151, 159 (Iowa 2010) (noting that we need not engage in both prongs of the ineffective-assistance analysis if one is lacking).  To show prejudice, Jordan must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *See Ennenga*, 812 N.W.2d at 701.  A reasonable probability is one "sufficient to undermine confidence in the outcome." *See Everett*, 789 N.W.2d at 158.

Here, we cannot conclude the evidence at issue would have enabled trial counsel to prepare a more adequate defense or that the fact the evidence was not introduced affected the result of the trial.  It was the State's theory that Jordan and Christensen were both involved in the murders, and indeed, that they were "partners" in completing the murders.  During Jordan's trial,[3] the State presented the jury with evidence from numerous witnesses, as well as statements by Jordan himself, which implicated Jordan's participation and supported his conviction.  The fact that Christensen may have possessed the murder weapon "at some time" prior to the murders had no bearing on Jordan's

---

[2] Public Defender John Wellman was appointed as Jordan's counsel.  Wellman died in August 2006.

[3] Christensen was charged and convicted in a separate trial for his participation in the murders.

participation in the murders. In other words, even assuming the substance of Erika's statements had been offered and admitted at trial, the jury would still be free to believe or disbelieve the testimony of witnesses, and to give that testimony as much weight as it determined the testimony should receive. *See State v. Hunt,* 801 N.W.2d 366, 377 (Iowa Ct. App. 2011). Jordan has not shown a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been any different.[4]

Jordan also contends his postconviction counsel was ineffective in failing to present sufficient evidence regarding Erika's statements and how the admission of such evidence would have affected the outcome of his trial. Because we have rejected his underlying claim on its merits, we conclude Jordan cannot establish his claim of ineffective assistance of postconviction counsel. *See State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010) ("Counsel has no duty to raise an issue that has no merit."); *Anfinson v. State*, 758 N.W.2d 496, 499

---

[4] Although the issue here is one of ineffective assistance of counsel, we find it helpful to distinguish these circumstances from those analyzed in *Flores v. State*, No. 10-0020, 2011 WL 1376777, at *3-5 (Iowa Ct. App. Apr. 13, 2011). Here, it is apparent from the record of Jordan's motion for new trial proceedings that trial counsel Wellman was aware of the gist of Erika's statements regarding the gun, including that he knew "the Tongues had brought a shotgun to Rick Christensen at some time before the murders," and that Erika knew Christensen kept it under the bed. *But see Flores*, 2011 WL 1376777, at *4-5 ("Clearly evidence that [a third party separate and distinct from Flores and not Flores] killed Davis is favorable to Flores's defense. Its nondisclosure could have affected [trial counsel's] trial preparation and the result of the trial." (citation omitted)); *see generally State v. Simmons*, 714 N.W.2d 264, 276 (Iowa 2006) (stating that to prove a breach of duty, a postconviction applicant must establish counsel did not act as a "reasonably competent practitioner" would have acted). Wellman proceeded to investigate the origin of the weapon, including questioning the Tongues "and they, of course, denied it." *But see Flores*, 2011 WL 1376777, at *5 ("[W]e agree with the district court that it is unlikely [trial counsel] would not have acted on that evidence if he had it."); *see generally State v. Brubaker*, 805 N.W.2d 164, 171 (Iowa 2011) (noting we presume counsel performed competently and we avoid second-guessing and hindsight).

(Iowa 2008) (stating a claim of ineffective assistance of counsel fails if either element is lacking).

We affirm the district court's ruling denying Jordan's application for postconviction relief.

**AFFIRMED.**