**IN THE COURT OF APPEALS OF IOWA**

No. 24-0842
Filed May 7, 2025

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**DARREN ANTWON DIGGS,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, David Nelmark (motions) and Jeffrey Farrell (trial), Judges.

A defendant challenges his conviction for first-degree murder. **AFFIRMED.**

Des C. Leehey of Cameron Leehey Law Firm, PLLC, Cedar Rapids, for appellant.

Brenna Bird, Attorney General, and Katherine Wenman, Assistant Attorney General, for appellee.

Considered without oral argument by Tabor, C.J., and Schumacher and Chicchelly, JJ.

**SCHUMACHER, Judge.**

Following a jury trial, Darren Diggs appeals his conviction for first-degree murder. He challenges the admission of evidence under the inevitable discovery rule. Specifically, he argues the district court erred in determining the inevitable discovery rule does not violate article I, section 8 of the Iowa constitution. The State rejects Diggs's constitutional challenge and counters that even if the inevitable discovery rule is unconstitutional, the admission of the disputed evidence was harmless. Upon review, we affirm.

## I.    Background Facts & Proceedings

Kalvyn Kline was parked in front of a family member's home, catching up with his brother Niclys, in the predawn hours of October 22, 2021. Niclys recalled that just before leaving, Kline received a phone call. Niclys estimated the time was around 5:30 a.m. Niclys hugged Kline, he told Kline he loved him, and Kline left.

Kline drove to an apartment complex where an apartment resident saw Kline's car park along the access roadway fronting one of the complex's residential buildings. The resident observed no one enter or exit the parked car. After a few minutes, the car moved to the roadway in front of the complex's nearby office building. The move caused the car's headlights to shine directly on the resident, so the resident went inside. Minutes later, the resident heard multiple gunshots. He looked outside and observed a person running from the direction of the car toward the residential building where the car had originally parked.

At 5:39 a.m., a second complex resident who also heard the gunshots called 911. The Des Moines Police Department dispatched officers to the scene. The first officers to arrive observed Kline "down inside the driver's seat of the vehicle."

One of the officers immediately pulled Kline from the car and began defibrillator-assisted CPR. But the extent of Kline's injuries was too severe. Paramedics initially observed Kline had suffered a gunshot wound to the head and one to the chest. After conducting a trauma assessment, paramedics determined the injuries were incompatible with life and discontinued life-saving measures.

Kline's cause of death was later determined by a Polk County medical examiner and forensic pathologist to be multiple gunshot wounds, not self-inflicted. Kline suffered seven gunshot wounds in total: one each to the neck, shoulder, and left arm; two to the head; and two to the chest.

At the scene, eight 9mm spent shell casings were discovered. Seven casings were brass colored and the eighth was black. It was later determined the black casing related to a hollow-point bullet, which was recovered from Kline's body. The brand of all eight casings was Norma, a brand of 9mm ammunition that an officer at trial testified was "not sold commonly in the United States."

As the investigation expanded beyond the immediate crime scene, detectives began reviewing surveillance video footage from the apartment complex. Surveillance footage from the back door of the residential building that Kline's car originally stopped in front of—which turned out to be the apartment building in which Diggs resided—showed a man exiting the building just after 5:30 a.m. The man wore jeans with a large bleach-spot design, a black Nike hooded sweatshirt with the slogan "Just Do It" written down the outside of each sleeve, the hood up, and black rimmed glasses. At approximately 5:39 a.m., the man reappeared in the camera view and briefly stood directly outside the door.

Officers also interviewed members of Kline's family. The interviews provided police with Kline's cellphone number and knowledge that Kline had a history of purchasing Xanax from someone named "D" or Darren. Kline's cellphone was never located. But the police were able to contact Kline's cellphone carrier and ultimately identify Diggs as a person of interest.

Having identified Diggs, police began the process of applying for a search warrant for Diggs's apartment. Meanwhile, officers returned to the apartment complex for surveillance and to potentially contact either Diggs or his girlfriend, who was the named lessee of the apartment where the two resided. Upon arriving, officers observed an individual that appeared to match Diggs's physical description. The individual was wearing dark rimmed glasses and a dark-colored hoodie with the hood pulled up. He had on a fannie-pack across his chest and was seen exiting the same building in which Diggs lived. Believing the individual to be Diggs, officers intercepted the individual pursuant to the homicide investigation.[1]

While some officers stayed with the intercepted individual—who was still believed to be Diggs—others proceeded to Diggs's apartment. Officers knocked on the apartment door. Diggs's girlfriend answered. With her consent, officers entered the apartment. To the officers' surprise, Diggs was sitting in a living room chair and wearing jeans with a large bleach-spot design matching the ones in the surveillance footage. Officers detained Diggs and proceeded to empty Diggs's pockets. They did not have a search or arrest warrant and did not provide Diggs

_____

[1] As officers would shortly discover, the intercepted individual was not Diggs, and this intercepted individual was eventually eliminated as a suspect.

with a *Miranda* warning.  From Diggs's pockets, officers extracted a single Norma-brand 9mm bullet, a fifteen-shot handgun magazine loaded with fourteen 9mm bullets, a plastic bag containing Xanax, and money.  In response to questioning, Diggs told officers his gun was located somewhere in the back of the apartment.

A search warrant was issued for the apartment.  Diggs's semiautomatic 9mm handgun was found in a pile of laundry.  The handgun had a fully loaded magazine with fifteen Norma-brand 9mm bullets.  Inside the gun case, which was found separate from the gun, officers found a box of Norma brand 9mm bullets.  The fifty-count box contained twelve bullets.  Officers also discovered a black Nike hooded sweatshirt with the slogan "Just Do It" written down the outside of each sleeve.

The State charged Diggs with first-degree murder in violation of Iowa Code section 707.2(1)(a) (2021), a class "A" felony.  Diggs moved to suppress all evidence obtained from the officers' warrantless search of Diggs and all statements made before he was given his *Miranda* rights.  He also argued that without the disputed evidence or statements—which were included in the search warrant application to support probable cause—the search warrant was unsupported and invalid.  The district court granted Diggs's motion on the evidence and statements. But the district court denied the motion with respect to the warrant because the court determined probable cause existed even excluding the suppressed information.

In response, the State moved to reconsider the admissibility of evidence seized from Diggs's pockets.  The State reasoned the inevitable discovery exception to the exclusionary rule should apply because Diggs would have been

searched when he was booked at the police station, and the granted search warrant authorized a search of Diggs's clothing. Diggs resisted, arguing the inevitable discovery rule is unconstitutional under article I, section 8 of the Iowa constitution. The district court granted the State's motion and ruled the evidence admissible. Following a jury trial, Diggs was convicted of first-degree murder.

Diggs appeals. Diggs challenges the district court's determination that the inevitable discovery rule is not unconstitutional under the Iowa constitution and the court's admission of the items from Diggs's pockets into evidence.

## II. Standard of Review

Diggs raises a constitutional challenge to the district court's denial of his motion to suppress the evidence discovered on his person. We conduct de novo review of constitutional challenges to the denial of a motion to suppress. *State v. Abu Youm*, 988 N.W.2d 713, 718 (Iowa 2023). "When the alleged error concerns the erroneous admission of evidence in violation of a defendant's constitutional rights, such error is typically subject to harmless-error analysis." *State v. Tyler*, 867 N.W.2d 136, 153 (Iowa 2015); *see, e.g., State v. Hensley*, 534 N.W.2d 379, 382 (Iowa 1995) (finding the admission of evidence in violation of the defendant's state and federal constitutional rights did not require reversal of defendant's conviction because the error was harmless).

## III. Harmless Error

The State argues that because of the harmless error rule we can uphold Diggs's conviction even if Diggs is correct that application of the inevitable discovery rule violates individual rights under article I, section 8 of the Iowa constitution. If correct, the harmless error rule permits us to affirm the conviction

even assuming Diggs is correct on his constitutional challenge. *See State v. White*, 9 N.W.3d 1, 14 (Iowa 2024) (recognizing reversal is not required for a harmless error involving the violation of a defendant's rights under the Iowa constitution)*. Accordingly, we turn first to the question of harmless error.

The harmless error rule derives from Iowa Rule of Evidence 5.103, which states, "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party." Iowa R. Evid. 5.103(a); *see Tyler*, 867 N.W.2d at 166 n.14. "Reversal is not required 'if the State establishes that the error was harmless beyond a reasonable doubt.'"[2] *White*, 9 N.W.3d at 14 (quoting *State v. Newell*, 710 N.W.2d 6, 25 (Iowa 2006); *accord State v. Simmons*, 714 N.W.2d 264, 275 (Iowa 2006). "If substantially the same evidence is in the record, erroneously admitted evidence is not considered prejudicial." *Simmons*, 714 N.W.2d at 276 (quoting *State v. Deases*, 518 N.W.2d 784, 791 (Iowa 1994)). "Our task then is to evaluate the evidence, other than" the evidence seized from Diggs's pockets, "and to determine whether it was so overwhelming that we are abidingly convinced" that the evidence from his pockets "did not contribute to the jury's finding of guilt." *White*, 9 N.W.3d at 15 (quoting *State v. Coy*, 433 N.W.2d 714, 715 (Iowa 1988)).

---

[2] The State presents its arguments under the constitutional harmless error standard. But the State also proposes that the exclusionary rule and the inevitable discovery rule are judicial remedies, not constitutional issues. As such, it argues the less strict, nonconstitutional harmless error standard should apply. Diggs does not respond to the State's harmless error arguments. Without addressing the State's proposal, we choose to apply the stricter constitutional harmless error standard.

Excluding the evidence from Diggs's pockets, the State presented significant evidence linking Diggs to the shooting. Kline was shot with 9mm Norma-brand bullets just outside Diggs's apartment building. Hours later in Diggs's apartment, officers found an unsecured 9mm handgun fully loaded with a fifteen-shot magazine and a box of Norma-brand 9mm bullets. The ammunition box was missing more bullets than those found in the apartment but no more than the total number of matching bullets and casings found that day.[3] Further, an officer testified at trial that Norma is an uncommon brand of ammunition. And phone records that were admitted into evidence showed multiple phone calls between Kline and Diggs on the morning of the shooting. In closing arguments, the State emphasized the records show that at "5:16 a.m., [Kline] calls the defendant[,]" and "at 5:29 [Kline] calls the defendant again."[4]

A detective also interviewed Diggs at the police station after Diggs was taken into custody. The detective gave trial testimony about that interview. During the interview, Diggs admitted to the detective that he had sold Xanax to Kline in the past; Niclys testified that Kline had been struggling with drugs. Diggs admitted going outside that morning. The building's surveillance footage shows Diggs went

---

[3] As explained above, the fifty-count box contained only twelve bullets. Fifteen matching bullets were loaded in the magazine found within the handgun, meaning the two items accounted for twenty-seven bullets. If counting the seven matching 9mm Norma-brand casings found at the scene of the shooting, thirty-four bullets would be accounted for. This leaves sixteen unaccounted-for bullets out of the fifty-count box—one more than the number held by the magazine used in Diggs's handgun. The loaded magazine and bullet found in Diggs's pocket were not needed to perform this analysis.

[4] Although Diggs disparages the use of the phone records at trial and in the State's closing arguments, Diggs does not raise any challenges on appeal to the admission of such records. So we include them in our harmless error analysis.

outside right around the time of the shooting, wearing the same jeans he had on when detained and the same hooded sweatshirt later found in his apartment. And after hearing gunshots, an eyewitness observed an individual running from the direction of the shooting toward Diggs's apartment building.

From the above, the State established the Xanax connection between Diggs and Kline, that Kline was experiencing struggles with drug use, that Kline and Diggs were in communication right before the shooting, that Kline was parked near Diggs's apartment building, that after the shooting someone ran away from the shooting and toward Diggs's apartment building, that Diggs left his apartment right around the time of the shooting and returned shortly thereafter, that Diggs owned a gun matching the murder weapon, and that Diggs possessed ammunition matching the bullet casings found around Kline.

Separately, the evidence seized from Diggs's pockets included a single Norma-brand bullet, a fifteen-shot magazine loaded with fourteen 9mm Norma-brand bullets, money, and a baggie containing a handful of Xanax. Because this evidence goes to Diggs's ownership of the matching ammunition and gun and his conduct regarding Xanax, the evidence from Diggs's pockets presents nothing new that would contribute to evidence of Diggs's guilt—substantially the same evidence is already in the record. So even if the inevitable discovery rule does violate our state constitution—which we express no opinion on here—the admission of evidence seized from Diggs's pockets is not prejudicial. *See Simmons*, 714 N.W.2d at 275–76.

Excluding evidence from Diggs's pockets, the record evidence is so overwhelming of guilt that it leaves no reasonable doubt the jury verdict would have

been the same even without the disputed evidence. *See State v. Walls*, 761 N.W.2d 683, 686–87 (Iowa 2009). Because substantially the same evidence is presented elsewhere and because of the overwhelming nature of the remaining evidence, we determine the disputed evidence is indeed "so unimportant in relation to everything else the jury considered that there is *no reasonable possibility* [the disputed evidence] contributed to [the defendant's] conviction." *Id.* at 688 (second alteration in original) (quoting *State v. Peterson*, 663 N.W.2d 417, 434 (Iowa 2003)). "Therefore, any alleged error is harmless beyond a reasonable doubt." *Simmons*, 714 N.W.2d at 276.

## IV. Conclusion

Even if the district court improperly determined the inevitable discovery rule is not unconstitutional under the Iowa constitution and therefore erred in applying the rule to admit the disputed evidence, the overwhelming evidence of guilt beyond the disputed evidence would render any error harmless. Accordingly, we affirm without addressing Diggs's state constitutional challenge to the inevitable discovery rule.

**AFFIRMED.**