# IN THE COURT OF APPEALS OF IOWA

No. 13-0346
Filed October 29, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ZYRIAH SCHLITTER,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Marsha M. Beckelman, Judge.


        Zyriah Schlitter appeals his convictions, following the death of his daughter, for child endangerment resulting in death and involuntary manslaughter by public offense. **AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

        Zyriah Schlitter, Newton, appellant pro se.

        Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, Jerry Vander Sanden, County Attorney, and Nicholas Maybanks and Lisa Epp, Assistant County Attorneys, for appellee.


        Heard by Danilson, C.J., and Vogel and Bower, JJ.

**BOWER, J.**

Following a jury trial on charges of first-degree murder and child endangerment resulting in death, Zyriah Schlitter was convicted of involuntary manslaughter by public offense and child endangerment resulting in death. On appeal, Schlitter claims the district court erred in declining to suppress statements he made in violation of his *Miranda* rights. He alternatively claims the statements were involuntary because his "will was overborne." Finally, Schlitter contends his trial counsel rendered ineffective assistance by failing to (1) move for a judgment of acquittal on lesser offenses, (2) timely object to prosecutorial misconduct, and (3) investigate.[1] We affirm.

### I. Background Facts and Proceedings

We state "the facts in the light most favorable to the verdict." *State v. Neiderbach*, 837 N.W.2d 180, 187 (Iowa 2013). Until the last month of her short life when her father had temporary custody, K.S. was a happy, healthy baby. After her birth in September 2008, she lived with her parents, Schlitter and Nicole, at the home of Jeri and John King, Nicole's mother and stepfather. Nicole and Jeri cared for K.S. most of the time, and Schlitter worked. K.S. slept through the night, ate well, was starting to talk, and loved to dance. Although she

---

[1] Schlitter filed a separate pro se brief claiming (1) trial counsel was ineffective by failing to object to the jury instructions not including (a) a definition of "custody or control" that included the possibility of Amy Parmer having such custody and control, (b) a definition of causation, (c) a definition of death in light of the withdrawal of artificial life support, and (d) an instruction on aiding and abetting; (2) the district court lacked statutory authority to submit involuntary manslaughter by public offense; and (3) the jury rendered inconsistent verdicts and the court incorrectly merged the offenses. After considering these arguments in light of the entire record, we conclude Schlitter's pro se claims are either without merit or were not preserved for our review.

had started to walk when she was only eight or nine months old, she sustained only minor bumps or bruises on her shins from climbing on furniture.

In the beginning of November 2009, Nicole and Schlitter ended their relationship. Schlitter eventually moved out to live with his grandparents, Donnabelle and Herbert Hartz. Thereafter, Schlitter visited K.S. on Wednesdays and cared for her on alternate weekends, which were spent either at his grandparents' house in Cedar Rapids or at the Hiawatha, Iowa apartment of his new girlfriend, Amy Parmer. Parmer had two children, a six-year-old son and a two-year old daughter.

In February 2010, Nicole's mother and stepfather divorced, forcing Nicole to make different living arrangements. Schlitter agreed to take care of K.S. for four weeks while Nicole made the arrangements. Schlitter and Nicole signed a temporary custody agreement.

### A. Schlitter Physical Care

K.S. moved in with Schlitter on February 22, 2010. Nicole tried to visit three times a week but was not always able to do so. On March 1, 2010, Schlitter took K.S. to a clinic for a well-child check—she was in very good health.

K.S. started attending daycare on March 2 and adjusted well during the first week—she played with the other children and ate and napped well. Schlitter dropped her off and picked her up. Andrea McAleer and Keri Sotelo were the daycare staffers in K.S.'s room. Parmer's child at the daycare was not in K.S.'s room. During the next two weeks, K.S. went from being a healthy toddler to a critically ill child with lethal injuries from physical abuse.

**March 6-7 Weekend.**  Schlitter and K.S. spent the weekend of March 6 and 7 at Parmer's apartment.  Parmer took care of K.S. on Sunday evening while Schlitter attended a weekly financial class at church from 6:00 to 8:00 p.m.

**Monday, March 8.**  McAleer arrived at the preschool, and when K.S. turned around, she immediately noticed bruising.[2]  After morning snack, McAleer was cleaning K.S.'s face with a wipe and discovered makeup on the wipe.[3]  Sotelo testified K.S.'s facial injuries were more apparent after her face was cleaned.  K.S. had a bruise on her forehead, a bruise and redness around her eye, marks on the side of her chin, chapped lips, and a cut on her lip.  McAleer checked under K.S.'s clothes for other injuries but found none.  She took photographs of K.S.'s face.

That same day Parmer came to K.S.'s room and asked McAleer how K.S. was doing, calling her a "little brat."  Parmer told McAleer that she, Parmer, had to be the disciplinarian.[4]  When McAleer asked how K.S. got her bruises, Parmer stated the bruised eye occurred when K.S. had tripped and fallen, hitting a bookshelf or table.  Parmer stated K.S.'s forehead bruise occurred when a Pack 'n Play fell out of a closet.  Although the staffers went to daycare director Ciarra McMurrin and expressed concern, McMurrin thought Parmer's explanations seemed feasible and elected not to contact the Iowa Department of Human

---

[2] Sotelo was there when Schlitter dropped off K.S., and she initially did not notice K.S.'s injuries because she was tending to other children.  By the time she recognized K.S. had a bruised face, Schlitter had left.

[3] The staffers kept the wipe, and it was eventually turned over to investigators.

[4] Up to that point in time, McAleer did not know of any connection between Schlitter and Parmer.

Services (DHS).[5]  K.S. developed a fever during the afternoon and did not attend daycare the rest of the week.

**Tuesday, March 9.**  Schlitter took K.S. to the Hiawatha pediatric clinic for the first time.  Schlitter told nurse practitioner Keeli Irwin that K.S was not sleeping as well, had a decreased appetite, and had a fever.  Irwin prescribed medicine for pink eye.  Irwin testified she saw "a golf ball-sized lesion [on K.S.'s forehead] that stuck out and it was bruised around that."  Also, "it was a significant enough bruise that I asked about it, and [Schlitter] said that she had recently fallen into, I think a coffee table, but it was a piece of furniture."  Schlitter did not seem concerned about the bruise, and he did not mention a falling Pack 'n Play.[6]  At trial, Schlitter testified Irwin never asked him about the bruise during this appointment.

**March 10-11.**  The next two days, March 10 and March 11, Schlitter again called for medical advice about K.S.'s continuing fever, congestion, and decreased appetite.  On Thursday, March 11, he was advised to take K.S. to the emergency room if she started to dehydrate or had trouble breathing.  Otherwise, he was to bring K.S. to the clinic to see Irwin on March 12 as previously scheduled.

---

[5] At trial, McAleer likewise testified Parmer's March 8 explanation "seemed like something that would happen."  McMurrin testified that if she had known about the wipe containing what looked like makeup, she would have made a different decision.

[6] On cross-examination, Irwin explained why she, as a mandatory reporter, had not contacted the DHS:

> [A]lmost every single fifteen-to-eighteen-month-old that we see in our office has bruises.  They fall into things.  That's very common.  They are not sturdy creatures.  And so I did ask about the bruise because it was a significant bruise.  He gave a good story.  I did not see any other red flags as far as bruising on the rest of her body.

**Friday, March 12.** At the clinic, Schlitter told Irwin that K.S. had vomited on him once the previous day and was fussy, not sleeping well, not eating well,[7] and tugging at her ears. Irwin found K.S.'s eyes were better but both of her ears were infected. Irwin prescribed an antibiotic and instructed Schlitter to return if the symptoms did not improve in two to three days or if K.S. has worsening fever or ear pain. Irwin observed K.S. still had a bruise on her forehead and it had not "changed much, maybe a little lighter in color."

**March 13-14 Weekend.** Schlitter and K.S. spent the weekend of March 13 and 14 with Parmer. K.S.'s fever broke on March 13. Parmer again watched K.S. while Schlitter attended his Sunday financial class.

**Monday, March 15.** K.S. returned to daycare and attended daycare through Friday, March 19, 2010. When Schlitter and K.S. arrived at the daycare, Sotelo saw more bruising on K.S.'s face, her eyes, and her chin. Sotelo asked Schlitter about the new bruises. In a monotone he replied, K.S. "likes to beat herself up" and "turned around and left." K.S.'s additional injuries included another bruise on top of the previous bruise on her forehead, black eyes, and bruising on both cheeks. McAleer described her appearance—"just heartbreaking." McAleer took photographs of K.S. and checked under her clothes. There was no additional bruising. McAleer and Sotelo notified a director

---

[7] Because Schlitter had told Irwin that K.S. was not eating well, Irwin talked to him about K.S. needing "to have a wet diaper or go to the bathroom at least once every eight hours. When [she cried,] there needs to be tears." Schlitter's step-grandfather testified to babysitting K.S. the week she was sick. The "whole day," K.S. "had no soiled diapers or no wet diapers." When Schlitter came home, the step-grandfather told him, "This little girl is going to get dehydrated. You are going to have to go intravenous." Schlitter then bought an eye dropper and tried to use it to give her water. K.S. resisted.

about K.S.'s injuries, and the DHS was called. During the day, staffers observed K.S. was not eating and seemed very lethargic. K.S. took long naps. Staffers had to wake her up at the end of naptime. K.S. would not play or interact with any of the other children, and she did not talk.

**Tuesday, March 16.** In the morning, DHS child abuse investigator Sarah Bliss observed K.S. at the daycare. Bliss observed K.S. "did have a bruise on her forehead and on her cheek." Bliss took photographs of K.S. Later, Bliss met with Schlitter. He stated K.S. was grouchier lately and described the recent eye and ear infections. Schlitter also told Bliss that K.S. "listened better for his girlfriend, Amy Parmer" and was better behaved at Parmer's apartment. Schlitter told Bliss K.S. had hit her head on a desk at Parmer's apartment the weekend of March 13-14. On the weekend of March 6-7, a Pack 'n Play had fallen out of a closet on her. He told Bliss he had not seen the Pack 'n Play fall on her and he had gone in afterwards. When Bliss asked Schlitter about his statement to daycare staffers that K.S. liked to beat herself up, Schlitter denied making the statement. During a later interview with investigators, Schlitter insisted he did not notice the bruises on K.S.'s cheeks until Bliss pointed them out to him.[8]

**Wednesday, March 17.** Schlitter brought K.S. over to Nicole's parent's house for a visit. Nicole described the evening: "She was not happy. She constantly cried and she was ripping her hair out on the left side of her head and she wouldn't want to do anything with me." Nicole had never seen her act that

---

[8] After the interview, Bliss recommended "an early access referral" to check K.S.'s development as well as therapy.

way before. She told Schlitter to take her home and put her to bed because she was sick. Nicole did not recall seeing any injuries on K.S. that day.

**Thursday March 18.** From Thursday March 18 to Sunday March 21, 2010, Schlitter's grandparents were out of town and not available to help Schlitter with K.S.'s care. On March 18, Nicole visited K.S. at Schlitter's grandparents' home and saw bruises on K.S.'s face that she had not seen before. Schlitter minimized the bruises, telling Nicole "she just probably bumped into something."

Also on March 18, Schlitter called the pediatric clinic to report K.S. had been very sleepy during the day, was going to bed earlier and sleeping in later, and still had a runny nose and cough. The nurse advised Schlitter to have K.S. finish the antibiotic and to call back if the symptoms continued or if he had other questions. At trial and during an interview, Schlitter admitted he did not tell the nurse all of K.S.'s symptoms—she was pulling out her hair, waking up with nightmares at daycare, and not eating well. Schlitter did not call the clinic in the following days.

**Friday, March 19.** Schlitter failed to take K.S. to her follow-up appointment for more shots. After daycare, Nicole took K.S. to visit Nicole's aunt but was forced to end the visit early because K.S. was screaming and pulling her hair out. Nicole saw "just the same bruises" on K.S.'s forehead and cheeks.

**Saturday, March 20.** K.S. and Schlitter spent the day and early evening in Cedar Rapids. That morning, Parmer sent a text message to Eric Olmstead, another man with whom she was having an intimate relationship: "And [I] love kids but [Schlitter's] daughter is already ending us." Parmer continued, K.S. "is

the most obnoxious kid in the world that gets babied when told no and has no discipline." Parmer also texted she would try to find a babysitter so she could go out with Olmstead. Olmstead testified he and Parmer would be sexually intimate once or twice a month as the circumstances allowed.

Despite K.S. sustaining injuries at Parmer's apartment on both of the previous weekends, Schlitter again took K.S. to Parmer's around 8:00 p.m. on Saturday evening. While he was putting her to bed after they arrived, she vomited on him.

**Sunday, March 21.** Schlitter became frustrated with K.S. and had to leave the room at lunch time. Schlitter then put K.S. down for her nap, and she woke up around 3:30 p.m. At 5:15 p.m., he left for his class and Parmer cared for K.S.

Two and one-half hours later, around 7:44 p.m., the Hiawatha Fire Department received a call for assistance from Parmer. When Fire Chief Michael Nesslage arrived, he found Parmer outside, crying and upset. Nesslage observed K.S. lying face up in a Pack 'n Play with her left arm posturing and her right side flaccid—"basically unresponsive" and not breathing adequately. Nesslage asked Parmer if K.S. had fallen and Parmer denied any fall. Nesslage carried K.S. to the ambulance where she was immediately ventilated for the ride to St. Luke's Hospital in Cedar Rapids.

At about 7:45 p.m., Parmer called Schlitter's cell phone. Hiawatha responder Wayne Compton talked with Schlitter. Compton testified he told Schlitter that K.S. was found unresponsive and they are working on her "right

now in the ambulance waiting to go to the hospital." Compton testified Schlitter did not ask him what "had happened" to K.S., "just what was going on." Schlitter drove to St. Luke's.

## B. St. Luke's Hospital

Dr. Julie Beard treated K.S in the emergency room and described K.S.'s condition upon arrival: "She was dying, very sick, and critically ill." K.S. "was bleeding in her eyes" from a "serious injury." Dr. Beard arranged for K.S. to be transferred by air ambulance to the University of Iowa Hospitals and Clinics (UIHC), and K.S. was at St. Luke's for less than an hour. When Nicole approached Parmer and asked what she had done, Schlitter stepped in and said, "She didn't do anything." Dr. Beard asked Schlitter and Parmer about the bruising, and they told her K.S. "gets in to everything" and is "klutzy." Schlitter stated he had been "meaning to follow up with her doctor regarding her easy bruising," but had not.

Nurse Nichole Morgan treated K.S. and observed Schlitter walk towards K.S.'s bed and tell K.S., "I'm sorry." Morgan documented Schlitter had "no emotional reaction to seeing" K.S. K.S.'s chart was marked suspected child abuse, and the DHS was called.

## C. UIHC

**March 21, 2010.** Dr. Charles Jennissen, a pediatric emergency medicine physician, described K.S.'s condition upon arrival—one pupil was larger than the other and neither pupil was responsive to light, showing K.S.'s "brain might be herniating." Dr. Jennissen observed K.S. had multiple bruises and "when you

see different bruises, different colors, you . . . know that they came from different times." Dr. Jennissen "particularly noticed" a bruise "that was striking to me was the one that was kind of around her jaw line, kind of underneath her jaw which didn't really appear typical for accidental injury." He also noted K.S. had "some bruises on her upper arms that looked suspicious possibly for grab marks, and those are fairly typical . . . abusive related bruises."

Dr. Jennissen met with the family and told them K.S.'s injuries "were sustained in a non-accidental way" and her condition was very grave. From the paramedics' report, Dr. Jennissen knew K.S. had been in Parmer's care, and he "wanted to know [what] time [Schlitter] was around and what [K.S.] was like at that time" to find out when the non-accidental trauma occurred. When Schlitter told Dr. Jennissen he had last seen K.S. at 5:15 p.m., Dr. Jennissen "wanted to see if she was normal at that point" and asked Schlitter what K.S. "looked like when he left and how she was acting." Dr. Jennissen testified that despite asking Schlitter that specific question three times, Schlitter "never really did say what she was acting like and what she looked like right before he left at 5:15," which Dr. Jennissen thought was "odd." Dr. Jennissen explained to the jury that a typical response would be, "Hey, I don't know what happened. I mean, I left. She was acting fine." Another typical response would be, "She was not acting herself. She was laying on the couch all day. I was really very concerned." Schlitter avoided the doctor's multiple questions and instead repeatedly talked about the past week. Schlitter also failed to mention he got frustrated with her at lunch time before he put her down for a nap at noon.

Dr. Jennissen testified the timing of K.S.'s injury "is always a difficult thing to know" but it "seemed like" it happened "that day. Exactly when . . . [is] hard to know." Finally, Dr. Jennissen testified:

> Q. . . . [I]f you were told that [K.S.], towards the end of this week was not eating, not playing, sleeping in late, going to bed early, pulling her hair, reacting psychologically to people around her [and were also told] there was only one call made to medical authorities on [March 18], would that surprise you? A. Well, if she's having symptoms like that . . . most parents would be kind of concerned and would seek attention more often.

Dr. Susannah Q. Longmuir is a pediatric ophthalmologist at UIHC, and she examined K.S.'s eyes. Her examination revealed K.S. had folds in the retina—"highly suggestive to some sort of crush injury or shaking violently."

Dr. Alexandra Volk, a pediatric intensive care physician, treated K.S. She testified to her observations after K.S. had undergone a CT scan of her head:

> I was very worried about how much [brain] edema she had . . . swelling of brain cells, especially on the left side and that she was in herniation meaning her brain had swelled to the point that it was cutting off blood flow. So she was extremely near death, and I also knew that there was blood outside the brain in a place where it's not supposed to be—a subdural hematoma.
> There were different densities of blood . . . and that indicates different ages of blood in the brain. So that's very worrisome to me for multiple repeated episodes of abusive trauma.

Dr. Volk "specifically asked" Schlitter if there had been any trauma. Schlitter responded that K.S. was "klutzy" but there was no specific history of trauma. Dr. Volk observed Nicole began making accusations against Parmer while Schlitter defended her by saying, "You weren't there. You don't know what happened." Dr. Volk brought in the neurosurgeons. Later, Dr. Volk learned K.S. had been pulling out her hair prior to March 21. She then opined: "[T]he fact K.S.

was pulling her hair out was a sign of how much stress she was under for days. That's what you do when you [are] being tortured."

The DHS child abuse investigator Roberta Hinman arrived at the UIHC. When Hinman introduced herself, Schlitter was teary-eyed and she waited "a good hour or more" for Schlitter to calm down before she could talk to him. Hinman and City of Hiawatha Investigator Rodney Fiser met with Schlitter and Nicole in a hospital waiting room. Hinman observed Schlitter "laid his head down sobbing" a few times during the conversation. Schlitter stated Amy was a good parent.

Fiser testified Schlitter stated K.S.'s fever broke Saturday, March 13 after she was prescribed Amoxicillin, and she was "good to go." When Fiser asked how K.S. was today (Sunday March 21), at first Schlitter said she was good. Later, Schlitter said K.S. had been moody since she had been sick, she had a personality change, and she had been clingy. Schlitter also stated after her nap on Saturday, March 20, she started to act like her same old self. Schlitter described the Sunday activities. K.S. sat on the couch and watched television with him, and they tried to get her to play. K.S. had to be right next to him the whole day and she cried a lot. He put K.S. down for her nap at noon.

Schlitter himself brought up the bruise on K.S.'s forehead and initially said he did not remember how she got it. Later, he pointed out that K.S.'s head was the same height as the kitchen and computer tables. Fiser testified when he asked Schlitter about the older bruise that was still healing, Schlitter talked about the Pack 'n Play incident.

**Monday, March 22**. In the early morning hours, Dr. Gregory W. Albert operated on K.S. and removed her left skull cap in an effort at decompression. When K.S. remained very ill, the surgeons then drilled a small hole in her skull and placed an intracranial pressure monitor to display her brain pressure.

Fiser and Hinman met with Dr. Volk, Dr. Albert, Schlitter, Nicole, and their immediate families. Fiser and Hinman learned K.S.'s bruising was extensive and also learned K.S. had serious brain injuries. Afterwards, Fiser requested assistance from the Iowa Department of Criminal Investigation (DCI) and met with DCI Agent Darrell Simmons.

When K.S. continued to have "severely elevated pressures," she was returned to the operating room for the placement of a drain to remove fluid from her brain. As to the timing of K.S.'s injuries, Dr. Albert testified "it's hard to know exactly . . . it was probably fairly recent, hours, perhaps a day when the injury occurred." He agreed K.S. could have suffered both a progressing injury and a very recent event—"It could have been multiple injuries and then one final fatal injury." Dr. Albert explained "there is a possible progression of symptoms" with shaken baby/abusive head injury trauma—"headaches, irritability, vomiting, lethargy, and then coma and posturing tend to come later."

**Tuesday, March 23.** Simmons and Fiser met with Schlitter and Nicole at the hospital. Nicole reported K.S. had not been herself during her last visit. For the first time, Fiser learned K.S. was pulling out her hair. Schlitter also talked about K.S. having a fever and being sleepy—sleeping eleven to twelve hours a night. He explained she would take a nap at daycare and then just lay around

with a daycare worker for the rest of the day. Schlitter reported K.S. woke up tired on Sunday March 21. Also for the first time, Schlitter described lunch on March 21—they gave K.S. pizza, which she would put in her mouth and would not chew. K.S. started to choke and they had to take it out of her mouth, which made her mad. Around that time Schlitter put her down for a nap, but after her nap she woke up tired. Also for the first time, Schlitter told the officers K.S. had been waking up from naps at daycare, crying like she was having a nightmare. At the end of the interview, Schlitter stated K.S. had thrown up on him just before bedtime on Saturday night. Schlitter did not tell the authorities he was so frustrated with K.S. around noon that he had to leave her with Parmer while he left to calm down.

When the neurosurgical interventions did not control the swelling, Dr. Volk placed K.S. in a medically-induced coma—"our last ditch effort for her survival."

**Sunday, March 28.** During the week K.S. was at UIHC, Schlitter was there continuously and never left. Parmer did not come to the hospital. Nicole and Schlitter made the difficult decision to remove K.S. from the ventilator and held her on March 28 as she died.

### D. Investigation

**March 30 Interview—Nicole.** Nicole told the investigators Schlitter gets frustrated easily but she did not think he would ever hurt K.S. Nicole did not like to leave Schlitter completely alone with K.S. because she was worried about his short fuse. Nicole stated she believed Amy Parmer was hurting K.S.

**March 30 Interview—Schlitter.** Schlitter stated he had seen Parmer spank her son but Parmer loves kids and he "fully trusted" K.S. with Parmer. If Schlitter was frustrated with K.S. and he was alone, he would put her in her playpen to give himself a little break. If someone else was there, that person would watch her while he walked away to cool off. That happened rarely, but it happened "a few more times when she was sick and very fussy, oh, the last couple of weeks."

When asked to talk about K.S.'s bruises, Schlitter stated he was not sure how she got the one on the right side of her head, but she was just the right height to hit her head on tables. He thought she got the bruise around her eye from the Pack 'n Play falling out of the closet on her. Schlitter denied he put makeup on the March 8 bruise and stated, "Oh, I don't even think Amy even owns any makeup."

> Q. Well, I mean, why . . . do you think somebody would put makeup over a black eye? A. To cover it up I suppose.
> . . . .
> Q. . . . [W]hen they wiped her face . . . makeup came off and the . . . bruise was darker, is what [daycare] related to us. When we talked to Amy, she said she didn't put makeup on it. A. Yeah. I'm trying to think . . . . I think [Amy] might [have] put some like vitamin K on it, I, or whatever it is to help heal the skin.

Schlitter stated: "I didn't even notice [the Monday, March 15 bruises] until the social worker told me on Tuesday that she had [them]. And then I picked her up and I finally, I looked at her face, and she had real light bruising on her cheeks," one on each side. Schlitter guessed those bruises came from the computer table. Schlitter also stated he did not see bruises or marks when he returned from financial class or from running an errand: "I didn't pay that close

attention to a lot of her, especially her smaller bruises, because she was very active."

Simmons pointed out K.S. had marks on the back of her shoulders. In the ensuing discussion Schlitter admitted, for the first time (1) he could have picked K.S. up roughly at times when he was frustrated, and (2) he was frustrated at lunch on March 21. Specifically,

> Q. . . . [Somebody's] not just picking [her] up, they're squeezing . . . with pretty good amount of force to leave bruises . . . . Did you ever pick her up like that and pick her up really fast and maybe some time when you got frustrated with her? I'm not saying you intentionally hurt your daughter, I'm not saying that by any means . . . . Did you ever have something like that where you [are] just like [K.S.], please, just stop crying . . . did you ever get frustrated with her like that? A. I'm sure I have.
> . . . .
> Q. Okay. What about the bruises under here? And the marks on here? [Simmons gestures to the body] A. Maybe that. I mean I picked her up a lot. I didn't do it violently.
> . . . .
> Q. . . . I think you picked her up a little bit too hard. I think you picked her up too hard, argh, stop crying, why do you cry all the time . . . . A. . . . I didn't get that frustrated with her. I didn't shake her.
> Q. I don't know how else to explain it . . . . A. I'm sure I, may have picked her up, you know, like you said, but I never shake her, I never shake her. I never hit her head.
> . . . .
> Q. Well, let me ask you this, is it possible you did something and didn't realize you did it as hard as you did? A. Other than picking her up? No.

In another portion of the interview, Simmons asked:

> Q. You didn't hurt your daughter? A. No. Not that I know of.
> Q. What do you mean not that you know of? A. Not purposely trying to hurt my daughter.
> . . . .

> Q. Did you get frustrated with her [anytime] on Sunday? A. Uh, that she wasn't eating lunch and I picked her up to set her down on her mat a few times [because] she kept getting up.
> Q. Okay. A. And it wasn't extremely hard or forceful. I picked her up, sat her down, and she did that enough times I had to take a break. Amy watched her for a few minutes.
> Q. Okay. A. That was the last time I got frustrated.

Schlitter thought K.S.'s tiredness the last few days was just getting over her sickness. But as soon as K.S. went to the hospital, he researched the possibilities of head trauma and learned K.S. had the symptoms of head trauma. Schlitter denied squeezing K.S.'s face to give her medicine. At the close of the interview, Schlitter said he thought Parmer was "just too nice of a person to hurt any kid." The officers videotaped this interview, and the State played the video for the jury at trial.

**DHS Report.** Around April 12, 2010, Schlitter received a copy of the DHS report on K.S.'s death. The report stated Parmer had referred to K.S. as "a little brat" at the daycare. At trial, Schlitter was evasive about the report's contents:

> Q. So isn't it true that you did know that Amy Parmer had referred to [K.S.] as a brat at the daycare before July of 2010? A. I don't recall reading that.
> . . . .
> Q. So you don't recall reading this report here in full? A. I don't know how thoroughly I read through it, no.

**February 2011.** Nine months later, Nicole talked to the investigators about a past conversation with Schlitter—"we were talking about how scared he was that he was going to be arrested for hiding what Amy did or something like that."

**April 2011.**  Schlitter, Nicole, and Nicole's new boyfriend, Cameron Heinz, were shopping at Wal-Mart.  Nicole saw Parmer and yelled, "That's the woman who killed" my daughter.  According to Nicole, the following exchange occurred:

> Schlitter:  Tell me what really happened that night.
> Parmer:    Nothing.  There was a previous injury.
> Schlitter:   I got a thirty-two page packet and you said some bullshit.
> Parmer:    Yeah, you said some bullshit too.
> Schlitter:  I know the blunt [sic] of it happened that night.
> Parmer:    No, it didn't.

During closing argument, the prosecutor emphasized this conversation, stating Schlitter and Parmer "essentially admit to what they knew they had done."

**June 9, 2011.**  Schlitter contacted investigator Simmons and requested a meeting.  Simmons agreed to meet at the Hiawatha Police Department.  At the meeting, Schlitter stated his purpose was to try to help with the investigation.  Schlitter stated he understood someone making an educated guess would tend to think he was responsible—all the "arrows" are "pointing to me."  Eventually, Schlitter admitted he first noticed K.S.'s black eye in the morning of March 8, he and Parmer had a conversation, Parmer told him a Pack 'n Play fell out, and he vaguely remembered Parmer putting "stuff" on the eye.  At first, Schlitter denied holding open K.S.'s mouth to put in the medicine.  Later, he stated it was a possibility, but he did not remember for sure.  The officers videotaped this interview, and the State played the video for the jury at trial.

### E. Criminal Proceedings

In July 2011 the State filed a two-count trial information charging Parmer and Schlitter with first-degree murder and child endangerment resulting in death.

In May 2012 the court granted Schlitter's motion to sever his trial from Parmer's. After conducting a hearing on Schlitter's motion to suppress evidence, the court denied the motion. A jury trial was held from December 3-21, 2012.

**Nicole's Trial Testimony.** Nicole became acquainted with Parmer when Parmer dated Nicole's cousin. Parmer, Nicole, and the three children would spend time together. After watching Parmer interact with her two children, Nicole had concerns about how Parmer treated them. Initially, Nicole believed Parmer caused K.S.'s injuries. But Nicole knew Schlitter, when he got frustrated with K.S., "would grab her fast or sit her down roughly." She explained Schlitter "likes to be by himself to calm down" so he "would leave the situation most of the time." As K.S. got older and became more mobile, Nicole observed Schlitter's frustration increasing. Nicole described an event as their relationship was ending:

> [K.S.] was crying in her bed at night, and he had to get up for work early so he got frustrated, and that [is] when I said, "She's just crying to try to tell us what's wrong," and he wadded up blankets, threw them in the crib towards her, and said F you to her" [and walked out of the room]. I told him I was tired of his anger.

Nicole also described being upset with Schlitter after she watched him get frustrated with K.S. in March. K.S. was starting to get sick, and he had put her in a time-out. Nicole testified Schlitter "roughly" forced K.S. to sit down—"He would grab her and sit her down, grab her and sit her down. Sit her down, sit her down." Nicole then told Heinz that they needed to get K.S. back.

Nicole had not seen K.S. without a shirt or diaper since mid-February. Nicole testified the bruising she saw on K.S. at the hospital was "absolutely not"

any bruising she had "witnessed previous to that day." While at the hospital, Nicole observed fifty new marks on K.S. "all over her body." Nicole testified she had a different perspective on the perpetrator of the abuse after she saw "the nail marks where you would pick up a child" in Exhibit 26. Nicole could tell someone with fingernails picked K.S. up roughly, and she believed Schlitter was responsible for the marks because he had picked her up too roughly *again* and Parmer "does not have any fingernails."

Nicole testified seeing a March 8 daycare photograph also changed her opinion as to Schlitter's responsibility—"Well, one, you can see knuckle marks under her eyes, and two, that was four days before he missed my visit. He was two hours late for my visit." Finally, Nicole described Schlitter's attempt to manipulate her testimony at trial: "[H]e called two days ago, he asked me to talk him up, back him up, when I testify."

**DCI Trial Testimony.** Agent Simmons described the pictures the DCI took showing numerous items of makeup at Parmer's Hiawatha apartment and at her new apartment. At the new apartment, the DCI found night cream with vitamin K in it. Also, DNA testing showed K.S.'s DNA on the tissue with makeup.

**Testimony of Parmer's Coworkers.** Heather Myers worked with Parmer at a restaurant. Myers testified to a time when she was giving Parmer a ride home from work. Parmer suddenly became emotional and said, "I might have killed a kid." Timothy Sprous testified he worked with Parmer at the restaurant and lived with Parmer from February to May 2011. Over a year after K.S.'s death, Parmer went out drinking with Sprous and Myers and became emotional.

She stated to Sprous, "You don't want to get involved with me." When Sprous asked what she was talking about, Parmer replied, "I took a baby's life" and "I took an eighteen-month-old's life." Parmer identified the baby as K.S. and told Sprous, "She had a head injury."

**Medical Testimony.** Dr. Gary L. Baumbach, a pathologist at UIHC, testified tissue from K.S. was preserved on March 22, 2010 at 12:13 a.m. In it he found macrophages, which occur as a response to an injury. But, macrophages don't form instantly and need about a twenty-four hour period to form. Once the macrophages are formed, however, they stay in the tissue for quite a while. Dr. Baumbach testified to the timing of the injuries. First, he opined K.S. had "a bleeding event" occurring from twenty-four to seventy-two hours before the tissue sample (injury in a window *between* midnight March 18 and midnight March 20 from midnight March 21 sample). Second, because Dr. Baumbach saw changes inside neurons that are not seen until approximately twelve hours after injury, an injury occurred "sometime around noon on March 21."[9]

Dr. Marcus Nashelsky, a pathology professor at UIHC and a medical examiner, opined:

> Usually there is some form of evidence in the form of a bruise or a number of bruises that we can say represent head impacts. We haven't used the word shaken in our discussion at all because in a case like this one, there are bruising injuries on the face. Therefore, there are impact injuries of the face . . . . [For example,] another person could have punched [K.S.].

---

[9] Dr. Patricia Kirby, a pathologist at UIHC, testified to an injury "event occurring on" March 21, 2010.

K.S.'s blood and membranes showed an injury that was "a few weeks old or so"—and "there were at least two separate events." Similar to Dr. Baumbach, his examination showed there had been some bleeding "perhaps forty-eight to seventy-two hours" before the sample (injury in a window *between* midnight March 18 to midnight March 19). He testified the more recent injuries could have happened "minutes to hours" before the 911 call, during a period of six hours as opined by Dr. Oral or possibly during a period extending out to noon to 1:00 p.m. on March 21—assuming she "was displaying some sort of functional or behavioral abnormality."[10]

Dr. Resmiye Oral, a UIHC pediatric child abuse expert, completed a child abuse assessment on K.S. Dr. Oral compared the bruises and injuries K.S. had in the hospital on March 22 with the bruises and injuries shown in the March 8, March 15, and March 16 photographs. She opined the March 22 injuries "were all different." She also explained it is not unusual for a child to cling to the person abusing them. Dr. Oral met with Schlitter and Nicole together. She explained her prior experiences in such interviews:

> Q. When you're interviewing these parents or caretakers of
> children that have been abused to the point that [K.S.] was, do you

---

[10] Dr. Volk testified similarly: "That's a difficult question because I don't know exactly how [K.S.] was on the day of her death. But I think the event happened minutes to hours before she presented to 911. She would not have been normal after that event."

Dr. Sameer S. Kamath, a pediatric intensive care physician at the UIHC, opined K.S.'s injury occurred sometime within twenty-four hours, and "more likely sooner than later."

Dr. Michael D'Alessandro explained the CT scan to the jury. He opined the onset of the massive swelling of K.S.'s brain was caused by an acute event fitting within the "hours-to-days" spectrum. Within that spectrum, he would lean towards the twenty-four-hour spectrum as opposed to the two-to-three-days spectrum.

expect or hope they will be as forthright as possible about history so you can provide the best medical care possible? A. I don't.

Q. Do you expect or hope that they will be forthright with you about their answers? A. Well, my experience is that the perpetrating parties are usually as vague as possible.

K.S.'s facial bruises and marks caused Dr. Oral concern about "fingerprints of a hand grasping the child's face," and "the facial injuries were very consistent with grabbing the child's face violently." K.S.'s frenum, or the piece of skin connecting the gum to the upper lip, was torn and pulled out—"And . . . this is one of the worse frenum tears I have seen for some time." Dr. Oral explained, "In cases of abuse and neglect, we see this in the context of something being forced into the mouth, and I usually never see this in isolation. It [is] always part of other abusive injuries."

Dr. Oral sees the kind of retinal hemorrhages K.S. had "in for instance, falling from a second story or third story onto a rigid surface or being thrown out of a motor vehicle in a car crash or an abusive head trauma." Dr. Oral stated: "[T]he facial injuries were very consistent with grabbing the child's face violently, and especially the left arm—upper arm injuries were consistent with grab marks." She also observed "two deep scrapes, although connected with a red injury line, and this is very concerning for a nail mark . . . . The scrape mark was continuing into the child's ear as well."

Dr. Oral opined the cause of K.S.'s death was non-accidental trauma. K.S. had "bruises from at least two separate time frames" and "was injured at least on two separate occasions leading to the injuries within her head." K.S.'s "older injuries would be at least older than seventy-two hours before admission to

the hospital [or 8:00 p.m. March 18 at the earliest], up to two weeks maximum." Dr. Oral believed "the person injuring the child must have been aware that the child's symptoms had something to do with what had happened to the child's head, and not seeking proper medical care for that condition was medical neglect which might have contributed to the final outcome." Dr. Oral, retrospectively analyzing, opined K.S. was showing clinical signs of a brain injury leading up to her final days.[11]

Referencing the March 15 photograph, Dr. Oral opined she would expect a reasonable caretaker to do more than call the doctor and ask about a child sleeping too much if "throughout the course of the week," the child "begins to become sleepy, stops eating normally, begins pulling out her hair," vomits, and "even may have nightmares." But if the caretaker knew that something had been inflicted on the child, "they wouldn't seek medical care for fear of the medical providers understanding this was an inflicted injury."

As to the timing of the newer, acute injuries, Dr. Oral opined those took place immediately to six hours before the injury—and based on literature, "more likely was minutes before." When relating an earlier injury to the recent injury, Dr. Oral opined, due to the initial injury, the final injury did not have to be as severe to cause damage, but the final injury was still a very significant event. Dr. Oral concluded both of these injuries, "in a constellation," were contributing factors to K.S.'s death. For the newer injury, K.S. "experienced rotational

---

[11] Dr. Oral stated the clinical signs included the fact that although her ear infection had been treated and her fever had resolved, "she was still not herself. Later on through record review, I learned she was reported to be clumsy. She wasn't playful. She wasn't eating as well."

acceleration-deceleration forces as in shaking most likely with an impact from a soft surface."[12] The actions creating the older injuries "would be similar" but not necessarily with impact "because her neurologic status was much milder with the older injuries."

At the close of the State's case, defense counsel moved for a judgment of acquittal on the murder count. The court denied the motion, and defense counsel presented evidence.

**Zyriah Schlitter Trial Testimony.** The defense theory was that Amy Parmer abused and killed K.S and deceived Schlitter. Schlitter denied ever hitting K.S. Schlitter stated K.S. was already sleeping when he returned from his Sunday financial classes. Schlitter testified K.S. was sleeping when he returned on March 7 and he first learned about the March 8 makeup during his March 30 interview. Conflicting with his statements at the March 30 interview, Schlitter testified Parmer wore makeup. Schlitter's testimony also conflicted with the testimony of nurse practitioner Irwin. Schlitter told the jury Irwin did not talk to him about a bruise during the March 8 appointment. Schlitter testified to his March 16 conversation with Bliss:

> Q. What did you talk about in general while speaking with DHS on that day? A. She asked me if I knew about the [March 15] bruises on her cheeks. I told her I didn't. I didn't see them until I actually picked her up that day after [Bliss] mentioned them. [Bliss] asked me about a bruise on her head. I gave her the best explanation I could.

---

[12] Dr. D'Alessandro stated the injury could be caused by shaking the child, or by slamming the child against a hard or even a soft object like a mattress, or by a combination of shaking and slamming.

After our de novo review of the March 15 and March 16 photographs, we conclude a reasonable jury could find Schlitter's statements not credible. Schlitter admitted not telling the nurse everything in his March 18 phone call—he did not state K.S. was pulling out her hair, she was waking up with nightmares at daycare, and she was not eating as much—"she had more symptoms."

On March 20 at 4:00 p.m., Schlitter took a video of K.S. on his phone because she was "being silly and playing." Schlitter spent the night of March 20 at Parmer's. She did not wake up fast and was clingy on March 21. Schlitter admitted becoming frustrated with K.S., leaving the room to take a break, and leaving K.S. with Parmer.

Schlitter testified he said "I'm sorry" to K.S. after he knew she had head trauma and after he knew it was not accidental. He denied making this statement as an apology for causing the head trauma. After K.S. died on March 28, he returned to his grandparents' house. He still loved Parmer, and she had never called K.S. a brat in his presence. Later, he learned Parmer was sexually intimate with Eric Olmsted while he was at the hospital with K.S.

**Trial Conclusion.** At the close of the evidence, defense counsel moved for judgment of acquittal on the first-degree murder charge and on the child endangerment alternative of "circumstances showing an extreme indifference to human life." The court overruled the motions. During closing argument, the prosecutor claimed Schlitter and Parmer "share responsibility for taking her life" and the "multiple periods of abuse." The prosecutor claimed the medical evidence showed a culture of abuse with injuries on March 21 in a window of six

hours and additional injuries in a window of twelve to twenty-four hours and also injuries within forty-eight to seventy-two hours. Further, the older bruising and daycare pictures showed injuries in the weeks prior to K.S.'s hospitalization.

After closing arguments, defense counsel objected to the last two minutes of the prosecutor's rebuttal argument, claiming it was improper argument. The prosecutor stated his statements were in response to defense counsel's closing that spoke of "the solemn oath involved with using reasonable doubt and some of the same type of sentiments." After reviewing the "real time" transcript, the court overruled the motion, stating the rebuttal argument "fairly talked about the defendant was afforded his right to a fair trial and . . . I think could also be in response to the solemn oath" statement used by defense counsel.

The jury returned a guilty verdict on a lesser offense of the murder charge—involuntary manslaughter by commission of a public offense—and returned a guilty verdict on the charge of child endangerment causing death. The court merged the sentences and ordered Schlitter serve an indeterminate term of fifty years for child endangerment causing death. Schlitter now appeals.

## II. Standards of Review

We review Schlitter's constitutional challenge to the district court's denial of his motion to suppress de novo. *See State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010). We examine the entire record—both the evidence introduced at the suppression hearing and the evidence at trial—and make an independent examination of the "totality of the circumstances." *Id.* We give deference to the district court's fact findings, with particular deference given to the district court's

assessment of the credibility of the witnesses. *Id.* However we are not bound by the district court's findings. *Id.*

We likewise review Schlitter's claims his counsel rendered ineffective assistance de novo. *See State v. Finney*, 834 N.W.2d 46, 49 (Iowa 2013). Generally we preserve claims of ineffective assistance of counsel raised on direct appeal for postconviction proceedings to allow full development of the facts surrounding counsel's conduct. *Id.* However, we will address the claims on direct appeal where the record is sufficient. *Id.* The record here is sufficient.

### III. Custodial Interrogation

Schlitter asserts a *Miranda* violation, claiming he was not properly advised of his *Miranda* rights during a custodial interrogation on March 30, 2010. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (requiring a suspect be informed of his right to remain silent and right to counsel). Schlitter claims all of his "statements during the March 30 interrogation must be suppressed." *See Palmer*, 791 N.W.2d at 844–45 (noting statements are inadmissible when the *Miranda* procedure is not followed). The State, on the other hand, claims Schlitter was not in custody at the time of his March 30 interview.

To bring a viable claim, Schlitter must have been "in custody" during an "interrogation." *Id.* Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *State v. Simmons*, 714 N.W.2d 264, 274 (Iowa 2006). Whether a suspect is in custody depends on the court's *objective* analysis of the extent of the restraints on his freedom of action

in light of whether "a reasonable man in the suspect's position would have understood his situation" to be custodial. *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009). The court takes four factors into consideration: "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the [Schlitter] is confronted with evidence of [his] guilt; and (4) whether the [Schlitter] is free to leave the place of questioning." *State v. Miranda*, 672 N.W.2d 753, 759 (Iowa 2003). Analyzing the facts of this case in light of the four factors, we conclude Schlitter was not in custody during his March 30 interview.

Schlitter acknowledges the interrogation room was unlocked, but points out the room only had one exit and was used exclusively for questioning. He claims the purpose of the interrogation was to gain incriminating statements from him. He also claims he was confronted by evidence of guilt. Finally, Schlitter claims he, subjectively, "clearly did not feel free to leave" based on the officers continuing to question him after he asked the officers to "just stop" when they were "getting too graphic" and based on the fact he did not leave until after he promised to come back the next day for a polygraph.

In denying Schlitter's motion to suppress, the district court specifically found Simmons and Fiser to be credible. Schlitter's motion did not single out the March 30 interview but broadly asserted his Miranda rights were violated in all four interviews. The district court concluded: "In each of the interviews, [Schlitter's] freedom of action was not curtailed to a degree associated with

formal arrest" and he "was not in custody during any of the interviews and he was free to leave the place of questioning in all of the interviews."

We first note the district court found credible the officers' testimony that on March 30 they were conducting an interview for the purposes of gathering background information and there were no plans to take Schlitter into custody because there was no evidence with which to charge him with a crime. This testimony is further bolstered by the fact Schlitter was not charged with any offense for another fifteen months. We defer to the court's credibility determination.

Second, Simmons did not use formal language or procedure to summons Schlitter on March 30. Rather, Simmons called Schlitter and asked if he would be willing to come to the DCI office in Cedar Rapids to answer additional questions and Schlitter agreed. Third, it is undisputed that Schlitter drove himself to the March 30 interview and the door to the interview room was always unlocked.

Finally, the interview ended at 6:40 p.m. Schlitter answered questions willingly and eventually ended the interview of his own volition in order to eat supper with his family—"My family's expecting me about 6:30 p.m. over at my aunt's." After our de novo review and after giving deference to the district court's credibility determinations, we conclude Schlitter was not subject to a custodial interrogation during the March 30 interview. Thus, his *Miranda* challenge fails.

#### IV. Involuntary Statements and Error Preservation

Alternatively, Schlitter claims that "even in a noncustodial setting," his March 30 statements must be suppressed if his "will was overborne" such that his statements were involuntary. *See State v. Neiderbach*, 837 N.W.2d 180, 200 (Iowa 2013) (using "the totality-of-the-circumstances test"); *State v. Madsen*, 813 N.W.2d 714, 722 (Iowa 2012) (ruling "statements are voluntary if the defendant's will is not overborne"). Schlitter claims "under the circumstances, his will was overborne."

The State contends Schlitter did not preserve error and is making dual claims on separate issues—a claim the statements were taken in violation of *Miranda* and a claim the statements were involuntary. *See State v. Snethen*, 245 N.W.2d 308, 311 (Iowa 1976) (stating the defendant raised two grounds in his motion to suppress (1) the statements were taken in violation of his *Miranda* rights and (2) the statements were "not voluntary"—"[t]hese are separate issues").

We agree with the State. Schlitter's motion to suppress did not claim his "will was overborne" and challenge voluntariness as a separate claim. The district court did not discuss any of the factors to be analyzed in a "will-was-overborne" analysis but instead focused solely on factors relevant to the custody issue under *Miranda*. *See State v. Madsen*, 813 N.W.2d at 722-23 (stating factors in a "will-was-overborne" analysis). Because this issue was not presented to and ruled upon by the district court, we will not address it on appeal. *See State v. Mitchell*, 757 N.W.2d 431, 435 (Iowa 2008).

## V. *Ineffective Assistance—Standards*

In order to prove trial counsel was ineffective Schlitter must show, by a preponderance of the evidence, (1) counsel failed to perform an essential duty and (2) he suffered prejudice as a result of counsel's failure. *See State v. Robinson*, 841 N.W.2d 615, 617 (Iowa Ct. App. 2013).

As to the duty element, counsel's performance is measured against the standard of a reasonably competent practitioner. *Everett v. State*, 789 N.W.2d 151, 158 (Iowa 2010). Schlitter must overcome the presumption of competent assistance. *See Millam v. State*, 745 N.W.2d 719, 721 (Iowa 2008). To establish prejudice, Schlitter must show "there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different." *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

## VI. *Ineffective Assistance—Acquittal on Lesser Offenses*

Schlitter challenges trial counsel's failure to move for judgment of acquittal on the offenses for which he was convicted—child endangerment resulting in death and the involuntary manslaughter by public offense.

Regarding the prejudice alternative on an acquittal issue, "we have required a showing that but for counsel's unprofessional errors, a reasonable probability of acquittal existed," *i.e.,* we inquire "whether the evidence presented is sufficient to sustain a conviction of the offense in question." *State v. Breitbach*, 488 N.W.2d 444, 446 (Iowa 1992). In making this inquiry, we examine the evidence in the light most favorable to the verdict. *Id.* "We consider the

evidence substantial if it can convince a rational jury the defendant is guilty beyond a reasonable doubt." *State v. Ross*, 845 N.W.2d 692, 702 (Iowa 2014).

The jury instructions for "child endangerment resulting in death" required the State to prove:

> 1. Between and including March 1, 2010, and March 21, 2010, the defendant was a person having custody or control over [K.S.].
> 2. [K.S.] was under the age of fourteen years.
> 3. The defendant:
>      a. Knowingly acted in a manner that created a substantial risk to [K.S.'s] physical health or safety; or
>      b. By an intentional act or series of intentional acts used unreasonable force that resulted in bodily injury or was intended to cause serious injury; or
>      c. Willfully deprived [K.S.] of necessary supervision or medical care appropriate to her age, being reasonably able to make such necessary provisions, which deprivation substantially harmed [K.S.'s] physical health; or
>      d. Knowingly permitted the continuing physical abuse of [K.S.].
> 4. The defendant's act resulted in the death of [K.S.].

On appeal Schlitter does not dispute elements 1 or 2, but challenges the sufficiency of the evidence on each of the four alternatives in element 3 and also challenges the evidence showing any act by him resulted in K.S.'s death.

**A. Schlitter Knowingly Acted in a Manner that Created a Substantial Risk to K.S.'s Physical Health or Safety**

The State must prove Schlitter "acted with knowledge that [he] was creating a substantial risk to the child's safety." *State v. Millsap*, 704 N.W.2d 426, 430 (Iowa 2005). Schlitter claims there were only two instances of Nicole and Jeri thinking he handled K.S. too roughly.[13] He contends the amount of force

---

[13] Nicole testified she saw him be rough with K.S. when he repeatedly sat K.S. in time-out. Jeri testified on one occasion she believed Schlitter took K.S. out of an Exersaucer

causing K.S.'s March 21 injuries was far more than those prior actions. Schlitter also claims a "person would have to be aware" to apply the amount of force testified to by the medical experts and his statements to the police, his texts to Parmer, his act of showing the texted symptoms of child abuse to the DHS and using them to try to figure out who abused K.S. show he did not know what had happened to K.S.

Schlitter additionally claims the doctors concluded K.S.'s fatal injuries most likely occurred immediately prior to the onset of K.S.'s symptoms and Parmer was the sole caretaker of K.S. before the onset of symptoms. He also claims this testimony is consistent with K.S.'s changes in behavior after he started dating Parmer. Schlitter concludes it is thus most likely the fatal act took place while Parmer was the sole caretaker and there is no evidence any acts by him caused K.S.'s death.

We note the medical evidence did not show that all of K.S.'s injuries happened under the exclusive care of Parmer. Rather, it showed all the injuries happened under the exclusive care of both Schlitter and Parmer.

The State responds, "Schlitter knowingly created a substantial risk to seventeen-month-old K.S. by leaving her with his girlfriend, Amy Parmer, even though K.S. had previously sustained bruises and other injuries while in her care."

Knowledge in this context means Schlitter "acted with knowledge" he "was creating substantial risk to the child's safety." *See State v. Leckington*, 713

---

too fast because he was consoling K.S. and K.S. had two straight red marks across her legs.

N.W.2d 208, 214 (Iowa 2006) (ruling "[e]xpert testimony, along with a good dose of common sense, would enable" a reasonable jury to conclude the defendant knowingly created a substantial risk). "Knowledge or intent is seldom capable of direct proof." *State v. Miller*, 308 N.W.2d 4, 7 (Iowa 1981). "Knowledge can be shown by reasonable inferences drawn from the circumstances surrounding the injury event and not only by direct evidence." *Millsap*, 704 N.W.2d at 430.

One reasonable inference regarding Schlitter's knowledge can be drawn from the timing of the events. On two Monday mornings after K.S. spent the weekend at Parmer's apartment, March 8 and 15, daycare staffers noticed bruising so significant that they took pictures and contacted the director, who called the DHS after the second incident. Both times, Parmer took care of K.S. while Schlitter was at a class. Schlitter dropped K.S. off at daycare and picked her up on both Mondays. A reasonable jury could find Schlitter's claims he did not know about the bruises not credible. The jury was not required to believe Schlitter's self-serving version of the facts. *See State v. Arne*, 579 N.W.2d 326, 328 (Iowa 1998). A reasonable juror could conclude Schlitter knew he was creating a substantial risk to K.S. by leaving her with Parmer on Sundays. *See State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006) ("Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury was free to reject certain evidence, and credit other evidence.").

The jury could also draw reasonable inferences about Schlitter's knowledge based on his inconsistent statements. *See id.* For example, during his March 30 interview, Schlitter denied knowing about the makeup, flatly stated

Amy does not wear makeup and then suggested Amy put vitamin K on the bruise. In his June interview, Schlitter admitted he knew about K.S.'s black eye on the morning of March 8, he and Parmer had a conversation about it, and he vaguely remembers Parmer putting "stuff" on the eye. At trial he equivocated about how K.S. looked on March 8 and his awareness of the makeup:

> Q. Well, you were there [on March 8] when something was being put on K.S's] eye; were you not? A. I believe I remember [Amy] putting some kind of vitamin K cream on is what she told me.
> Q. Okay. And correct me if I'm wrong, but there was a conversation that morning as well—you say vitamin K was being put on [K.S.]. It was later determined to be makeup. But . . . there was a conversation about that black eye that morning with Amy; wasn't there? A. I don't remember.

The prosecutor then refreshed Schlitter's recollection that in the June interview he was asked, "So there was a conversation about her black eye that morning [March 8]; right?" and Schlitter answered, "Yeah, I must have." Schlitter, in June, also stated, "Well, we noticed it [black eye]." The questioning at trial continued:

> Q. Okay. So is it your testimony today that you and Amy Parmer had a conversation about the black eye on [K.S.]? A. I honestly don't remember.
> Q. All right. A. [June] was a year and a half later.
> Q. Okay. But it's a pretty important conversation regarding an injury to your child that was later determined to have makeup on it; am I right? A. Yes.
> Q. Okay. And so do you remember today having a conversation with Amy Parmer about that? A. Not a conversation, no.
> Q. Okay. But on June 9, 2011, you did tell [the officer] that: didn't you. A. I guess I did.
> . . . .
> Q. Okay. So is it fair to say that you were aware when [K.S.] went to daycare that she had a black eye? Is that fair to say based on what we've heard here? A. I wouldn't call it a black eye.
> Q. That [is] the way it was referred to. A. It was referred to as a black eye, yes.
> Q. All right. A. It was not very prominent.

[The prosecutor showed Schlitter a March 8 photograph.]
Q. Okay. And so your testimony is that this black eye was not prominent that day? A. It looks red to me.

Admissions are evidence, and admissions may be implied by Schlitter's *conduct* "subsequent to a crime, including fabrication, when such conduct indicates a consciousness of guilt." *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993). "A false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt and the false story is relevant to show that the defendant fabricated evidence to aid his defense." *Id.* A reasonable jury could conclude Schlitter joined with Amy to make the March 8 bruises look less severe by using makeup. A reasonable jury could conclude the injuries resulted from abuse by Schlitter or Parmer or both since joint efforts were made to cover the injuries and to minimize the injuries.

A reasonable jury could credit Sotelo over Schlitter's denial of making the March 15 statement, "She likes to beat herself up." At trial, Schlitter admitted he did not tell the nurse all of K.S. symptoms when he called for medical advice on March 18. When his symptom-reporting omissions and non-credible denial of Sotelo's testimony are viewed together, a reasonable jury could conclude Schlitter knew K.S. was in danger but he was unwilling to call attention to himself or Parmer by providing a full list of her symptoms when he called for medical advice two days after the DHS had questioned him about her bruises.

Dr. Beard, the first doctor to treat K.S., testified to her discussion of K.S.'s condition with Schlitter: "I remember being in the family consultation room explaining how sick [K.S.] was and how [she] could die and she was dying, and

[Schlitter] had no reaction, didn't ask any questions, didn't cry." Dr. Beard testified, generally, parents ask her questions when she is telling them their child is gravely ill. A short time later, Schlitter said, "I'm sorry," to K.S. When his "I'm sorry" admission is combined with his total failure to react to Dr. Beard's message, a reasonable jury could believe Schlitter's statement to K.S. demonstrated his "*knowledge*" that he was responsible—at least in part—for her condition.

Schlitter's inconsistent or incomplete or evasive statements during his multiple interviews provides further evidence of his knowledge of the substantial risk to which he was subjecting K.S. During the first interview at UIHC with Fiser and the Hinman, Schlitter did not tell them everything he knew about K.S.'s symptoms. During the interview on March 23 with Fiser and Simmons, Schlitter first revealed additional, *significant* symptoms: K.S. had been pulling out her hair, she was sleeping eleven to twelve hours a night and would "wake up slow," she was waking up from naps at daycare crying as though she were having a nightmare, she threw up on Schlitter just before bedtime on March 20, and she had been given pizza for lunch on March 21 and tried to swallow it without chewing.

Additionally, the jury learned that Schlitter and Parmer had exchanged a number of text messages around the time K.S. was hospitalized and after her death.[14] Some texts speculated on how she could have received her injuries and

---

[14] Investigators could not obtain texts exchanged on March 22 and March 25 because the phone company had server problems on those days. Therefore, none of the texts sent on those days were saved.

referred obliquely to attempts to come up with an explanation for K.S.'s injuries that did not point to either Schlitter or Parmer. For example, on March 23, 2010, Parmer texted Schlitter, "The web stuff [I'm] sending you is also from a government site and other ones. I will send the site addresses also." "The web stuff" was information Parmer e-mailed to Schlitter about the symptoms of shaken baby syndrome and head trauma. Later that day, Schlitter texted Parmer, "[I'm] glad you found all that info, she had a lot of those symptoms the past coup[l]e weeks, and [I've] told everyone about her symptoms." Parmer responded, "Right. [I'm] glad [I] I found them. I have to go talk to cops again tomorrow." A reasonable jury could conclude the injuries resulted from abuse by Schlitter or Parmer or both since joint efforts were made to understand the symptoms of abuse before they were subject to additional police interviews.

Finally, on March 31, three days after K.S. died and one day after Schlitter's March 30 interview, Schlitter sent Parmer a text that showed his intimate relationship with Parmer took priority over K.S.: "[W]e are free to do more without worrying [a]bout being walked in on lol [laugh out loud]." A reasonable jury could conclude Schlitter callously picked Parmer over his daughter despite his daughter suffering numerous injuries while staying at Parmer's apartment.

As to alternative (a)—knowingly acting in a manner that created a substantial risk to K.S.'s health or safety—the overwhelming evidence of K.S.'s injuries unquestionably being caused by abuse, the timing of the injuries, Schlitter's evasiveness when questioned by daycare staffers, doctors,

investigators, and the prosecutor at trial, combined with Schlitter's failure to seek medical care after March 18, all the while knowing he did not provide the nurse with all symptoms in his March 18 phone call, provide substantial evidence.

**B. Schlitter by an Intentional Acts or Series of Acts Used Unreasonable Force that Resulted in Bodily Injury *or* Was Intended to Cause Bodily Injury**

Schlitter jointly argues this alternative and the prior alternative, relying upon the claims asserted above for this issue. Focusing our appellate analysis on the resulted-in-bodily-injury option, our review of the record shows substantial evidence supporting alternative (b). Dr. Oral testified it is not unusual for a child to cling to the person abusing them. Nicole testified to Schlitter's increasing frustration with K.S. as she became more mobile. Nicole also stated she did not want to leave K.S. alone with Schlitter due to his "short fuse." Nicole wanted to get K.S. back after she watched Schlitter roughly grab K.S. over and over and sit her down while K.S. was starting to get sick. Despite Schlitter's attempt to manipulate her testimony, Nicole told the jury she believed Schlitter again picked K.S. up too roughly, causing the numerous bruises depicted in the photographic exhibits. In the June interview, Schlitter admitted to becoming frustrated with K.S., to having picked her up roughly, and to having squeezed her face.[15]

Dr. Volk testified K.S. pulling out her hair is a sign of being under extreme stress for days. Doctors also testified K.S. suffered at least two traumatic events

[15] Schlitter's grandmother testified Schlitter sometimes became frustrated while giving K.S. her oral medicine and would forcibly hold her head still with his fingers. He also bought an eyedropper to force water because he was worried about dehydration. Schlitter's step-grandfather testified K.S. resisted taking her medicine, and Schlitter tried the best he could to get her to take it.

with the older event occurring several days before K.S. was hospitalized. This "several days" period coincides with the March 18-21 period when Schlitter's grandparents were out of town and not available to help him with K.S's care. Until Schlitter moved out of Nicole's home, he had never taken care of K.S. for more than forty-eight hours at a time, and during those forty-eight hours either his grandparents or Parmer were present. Schlitter admitted he was more frustrated with K.S. when she was sick and understood "the arrows" pointed to him.

As to the more recent traumatic event, in his June interview Schlitter admitted he was frustrated with K.S. at lunch time on March 21 and repeatedly picked her up and sat her down. He admitted being so frustrated that he had to leave the room. Pathology witnesses testified the more recent traumatic event could have occurred around noon on March 21. Dr. Oral opined an older and a newer traumatic event contributed to K.S.'s death, "in a constellation," and substantial evidence showed Schlitter was caring for K.S. during those times.

K.S. showed signs of extreme injury the week of March 15. Schlitter's intentional infliction of physical abuse is shown by his failure to mention her serious symptoms on March 18 and by the fact he failed to take her to her March 19 appointment—three days *after* he had been questioned about her bruises by the DHS and two days *before* she was rushed to the hospital. At trial, Dr. Oral addressed K.S.'s recovery from her older injuries—given that she was still moving around "until the very last day, [K.S.] might have recovered from those injuries and gone to her baseline, or she might have deteriorated to a more grave neurologic status even if it's not as severe as the one she ended up with." With

the second option—some deterioration—her caretakers could take one of two paths. One, seek medical care early enough to help her recover. Two, especially if they knew that "something was inflicted" on her, not seek medical care "for fear of the medical providers understanding this was inflicted injury" and only seek medical care when it is too late for intervention. A reasonable jury could find Schlitter chose the second path and did not seek medical care for K.S. after March 18 "for fear of the medical providers understanding this was inflicted injury" by him.

Schlitter's lack of outrage or curiosity at St. Luke's Hospital about what had happened to K.S., his refusal to tell Dr. Jennissen at UIHC what K.S. had been like when he left for his class, his lack of concern about her bruises, his non-credible statement that Irwin failed to ask him about the early bruise, his varying accounts of how K.S. obtained the bruises, and his "I'm sorry" statement to K.S. in the first emergency room, when added to the evidence discussed above, show substantial evidence Schlitter intentionally inflicted injuries on K.S. that resulted in bodily injury, alternative (b).

**C. Schlitter Willfully Deprived [K.S.] of Necessary Supervision or Medical Care Appropriate to Her Age . . . Which Deprivation Substantially Harmed [K.S.'s] Physical Health**

Schlitter claims K.S. was always supervised and he repeatedly took her to the medical clinic or called about her illnesses. Schlitter believed K.S. was sick and thought her bruises were typical for a kid. He points out neither Irwin nor Bliss took action regarding the bruises. We note K.S.'s bruising was not prominent or concerning when observed by Irwin and Bliss. Schlitter concludes

he was taking every reasonable step to provide supervision or medical care for K.S.

The State responds Schlitter deprived K.S. of supervision necessary for her well-being by willfully failing to protect her from physical abuse at the hands of Parmer under the circumstances discussed in alternative (a). We specifically note the text Schlitter sent to Parmer about their sex life only days after K.S. had died and agree with the State. There is no reason to repeat our analysis.

Second, the State claims Schlitter willfully deprived K.S. of necessary medical care by failing to seek care when she exhibited signs of devastating injury. We agree and adopt our discussions above. We also note Dr. Oral testified the failure to seek medical care for the symptoms K.S. was exhibiting "was medical neglect which might have contributed to the final outcome." Dr. Oral also opined that one "probable" scenario is K.S. had these lingering symptoms and manifestation of a brain injury, but medical care was not sought in time. We conclude substantial evidence supports alternative (c).

### D. Knowingly Permitted the Continuing Physical Abuse of K.S.

Schlitter argues he did not knowingly permit Parmer to abuse K.S because he was an inexperienced, first-time father who did not recognize that K.S. was being abused. He claims his lack of knowledge is demonstrated by his text messages to Parmer and his behavior with DHS investigator Hinman. "Further, K.S. never reacted negatively to him."

We first note Dr. Oral stated an abused child will cling to their abuser. Second, our analysis in alternative (a) shows substantial evidence proving

Schlitter was aware that Parmer was physically abusing K.S. but continued to entrust K.S. to her care every Sunday evening. Thus, our analysis also shows substantial proof supports alternative (d).

### E. Conclusion

After trial from December 3-21, 2012, creating over 2400 pages of transcript, the jury assessed the credibility of thirty-nine witnesses. A reasonable jury could find Schlitter guilty beyond a reasonable doubt under each of the instruction's four alternatives for child endangerment resulting in death. Thus, trial counsel did not breach an essential duty by failing to move for a judgment of acquittal. Second, Schlitter failed to meet the prejudice prong of this claim by failing to show "but for counsel's unprofessional errors, a reasonable probability of acquittal existed."[16] *See Breitbach*, 488 N.W.2d at 446. Accordingly, defense counsel did not render ineffective assistance.

## VII. Ineffective Assistance—Prosecutor Misconduct

Schlitter claims trial counsel's failure to timely object to the prosecutor's misconduct during closing argument denied him a fair trial because the prosecutor's statements improperly urged the jury to decide the case on

---

[16] Schlitter also claims counsel was ineffective in failing to move for judgment of acquittal on the offense of involuntary manslaughter by public offense. He claims there is insufficient evidence Schlitter committed the public offense of child endangerment. The jury was instructed the State first must prove Schlitter "recklessly committed" the crime of child endangerment under any of the four alternatives already discussed extensively. Noting "reckless" is a high bar; Schlitter claims his conduct under the circumstances does not rise to the level of "highly unreasonable" or "extreme departure." Second, the State had to prove that when Schlitter so acted, he unintentionally caused the death of K.S.

As discussed above, there is substantial evidence for each of the four alternatives, and we conclude a reasonable jury could find Schlitter acted recklessly. Also as discussed above, there was substantial evidence Schlitter's acts caused the death of K.S. Thus, counsel did not breach a duty resulting in prejudice by his inaction.

something other than the evidence by arguing: (1) to do justice for K.S. the jury had to find Schlitter guilty; (2) the jury had a sacred duty to find Schlitter guilty to protect the public and the innocent; and (3) the jury had to hold Schlitter accountable.[17]

For Schlitter to establish a due process violation based upon prosecutorial misconduct, he must first establish proof of misconduct. *See State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). "Misconduct occurs when the prosecutor [uses] unnecessary and over inflammatory means that go outside the record or threaten to improperly incite the passions of the jury." *State v. Carey*, 709 N.W.2d 547, 556 (Iowa 2006). If he establishes misconduct, Schlitter must then prove the misconduct resulted in prejudice to the extent he was denied a fair trial. *See Graves*, 668 N.W.2d at 869.

---

[17] The prosecutor argued:

You've heard all but the final lines of [K.S.'s] story. Now you have the opportunity to write the final lines of her story. By holding accountable those that took [K.S.] from this world, the Defendant, her own father, *you can write justice to her story.*

. . . .

[T]he laws of our country also grant our citizens *the solemn and sacred duty of protecting the safety of the public and of the innocent by judging those that commit brutal acts of abuse and neglect against fellow humans to be guilty* when it's been shown beyond a doubt that's reasonable.

What more important honor can there be bestowed *to protect the rights of citizens and acknowledge those rights and find them accountable through the rest of us.* This is how our justice system works. This trial has demonstrated how our justice system works.

Mr. Schlitter was afforded his right to a fair trial. He had an opportunity to confront the witnesses against him. The evidence has been submitted and shows he's guilty of murder in the first degree and child endangerment beyond a reasonable doubt. The trial is now done and *the sacred duty is now being passed on to you. You can write the final lines of [K.S.'s] story, and you can also be authors of justice* with the jury form.

(Emphasis added.)

Schlitter cites *State v. Musser*, where the court recognized "there is always some gray area between proper and improper comment." 721 N.W.2d 734, 755 (Iowa 2006). The *Musser* court ruled the prosecutor "inappropriately diverted the jury from its duty to decide the case solely on the evidence by injecting issues broader than the guilt or innocence of the defendant and by making predictions of the consequences of the jury's verdict." *Id.* (finding misconduct where the prosecutor asked the jurors to find the defendant guilty "because it is the right thing to do," and "because the only way that he will care is if you make him care," and urged the jurors to "[m]ake him responsible because, if you don't, no one will"). The *Musser* court then turned to resolving whether the defendant was prejudiced by the misconduct and ruled Musser was not denied a fair trial:

> The evidence against the defendant was strong, the comments did not go to a central issue in the case, and the improper statements by the prosecutor were isolated. In addition, the jurors were instructed they were to decide the defendant's guilt or innocence "from the evidence and the law in these instructions," and that evidence did not include "[s]tatements, arguments, and comments by the lawyers."

*Id.* at 757.

Even if we *assume*—as Schlitter argues—the prosecutor's statements constituted misconduct, based on our review of the entire record we do not believe the alleged misconduct was sufficiently prejudicial to require a new trial. *See id.* Schlitter's case is one that necessarily involves emotion—the death of a child. Here, as in *Musser*: (1) the jury was specifically instructed to base its verdict "only upon the evidence and these instructions" and that the "statements,

arguments, questions, and comments by the lawyers" are not evidence; and (2) the case against Schlitter was strong—the medical experts agreed K.S. died from non-accidental trauma and agreed abuse was inflicted on more than one occasion causing multiple injuries. It is undisputed Schlitter cared for K.S. during the time the trauma occurred and he did so at a time when his usual helpers, his grandparents, were gone. In the June interview, Schlitter admitted the "arrows" of guilt point to him. In addition, the prosecutor's statements constituted a general exhortation to the jury and did not undermine Schlitter's defense by focusing on any particular issue or witness. Finally, the challenged statements were isolated, as shown by the fact the challenged comments occurred on two transcript pages of the sixty-five overall pages of the prosecutor's closing arguments.

In these circumstances, Schlitter was not denied a fair trial. Accordingly, counsel was not ineffective in failing to make a meritless objection to the prosecutor's statements. *See id.* at 752.

### VII. Ineffective Assistance—Failure to Investigate Parmer's Co-workers

Schlitter's trial occurred before Parmer's trial. On January 29, 2013, Simmons conducted an interview of Parmer's coworker Brandi Betts. Betts stated Parmer was fired for taking money from the restaurant and Parmer would constantly change her story about what happened when she discussed K.S.'s death with employees. The State informed Schlitter's defense counsel of the interview, and counsel filed a motion for new trial based on newly discovered evidence. The motion alleged: (1) Schlitter's "whole trial strategy was premised

on the fact that Ms. Parmer was the one responsible for the injuries and death and that [Schlitter] knew nothing about it"; (2) Betts would have been called to show the jury Ms. Parmer "was constantly lying and changing her story about the injuries she caused"; and (3) Betts's testimony "would have changed the jury's mind as to whether [Schlitter] had any knowledge of Ms. Parmer's actions because it showed Parmer was lying to multiple people from the very beginning," and the jury thus could infer she also deceived Schlitter. The court denied the motion.

On appeal, Schlitter alleges a competent attorney would have questioned Parmer's coworkers prior to trial and discovered this evidence. Schlitter further claims he was prejudiced because the testimony showed Parmer was a deceitful person and would have supported the theory did not know about the abuse, in part, because of Parmer's deceit.

We conclude Schlitter has failed to show the result of the trial would have been different if the evidence from Betts had been presented; thus, his ineffective-assistance claim fails on the prejudice prong. Schlitter contends the Betts evidence supports his claim he was unaware of the abuse. But this evidence does not overcome the abundant evidence discussed above in section VI showing Schlitter was aware of the abuse and nevertheless defended Parmer.

Second, Betts's testimony that Parmer gave varying accounts of how K.S. sustained her injuries and stole money can hardly be more beneficial to Schlitter than the evidence at trial that Parmer told one friend she had taken K.S.'s life and told another friend she "might have killed a kid." That testimony *directly*

implicates Parmer and is stronger than the *inferences* arising from Betts's testimony.

Finally, the State presented other evidence showing Parmer was deceitful. Nicole testified Parmer had made a "fool of a man" before and she thought Schlitter was a fool when he defended Parmer at the hospital. Eric Olmstead, who had an intimate relationship with Parmer, testified Parmer deceived him "about a whole lot of things." The defense also presented evidence of Parmer's deceitfulness. Schlitter testified he had been warned about Parmer, he did not realize she was seeing another man, and he did not know Parmer had called K.S. a brat.

In the circumstances of this case, Parmer has failed to prove he was prejudiced by counsel's failure to investigate. Thus, counsel did not render ineffective assistance.

**AFFIRMED.**